**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

(1) YOLANDA LUCAS, as the Special
Administrator of the Estate of MICHELLE
ANN CADDELL, Deceased,

      Plaintiff,

v.

(1) TURN KEY HEALTH CLINICS, LLC, a
Domestic Limited Liability Corporation;
(2) VIC REGALADO, individually and in his
official capacity as Tulsa County Sheriff;
(3) BOARD OF COUNTY
COMMISSIONERS OF TULSA
COUNTY;
(4) GARY MYERS, MD; AND
(5) SHIRLEY HADDEN,

      Defendants.

20-cv-00601-JFH-CDL

JURY TRIAL DEMANDED

ATTORNEY LIEN CLAIMED

## COMPLAINT

COMES NOW Yolanda Lucas ("Plaintiff"), Special Administrator of the Estate of
Michelle Ann Caddell ("Ms. Caddell"), deceased, and for her causes of action against the
above-named Defendants, alleges and states the following:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff is a citizen of Oklahoma and the duly appointed Special Administrator of
the Estate of Michelle Ann Caddell ("Decedent"). The survival causes of action in this matter are
based on violations of Decedent's rights under the Fourteenth Amendment to the United States
Constitution. Decedent was, at all times pertinent hereto, a pretrial detainee in the custody of the
Tulsa County Sheriff's Office.

2.    Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited
company doing business in Tulsa County, Oklahoma.  Turn Key is a private correctional health

care company that contracts with counties, including Tulsa County, to provide medical professional staffing, supervision and care in county jails.  Turn Key was at all times relevant hereto responsible, in part, for providing medical services, supervision and medication to Ms. Caddell while she was in custody of the Tulsa County Sheriff's Office ("TCSO"). Turn Key was additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail ("Jail"), and for training and supervising its employees. Turn Key was, at all times relevant hereto, endowed by Tulsa County and its Board of County Commissioners with powers and/or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

3.     Defendant Vic Regalado ("Sheriff Regalado" or "Defendant Regalado") is, and was at all times relevant hereto, the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma, and acting under color of State law.[1] Sheriff Regalado is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity, such as is brought herein, "is the same as bringing a suit against the county." *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009)*; see also Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.*, 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff Regalado in his official capacity, Plaintiff has brought suit against Tulsa County and the TCSO under § 1983.

---

[1]     Pursuant to applicable law, the Tulsa County Sheriff is the "Tulsa County official responsible for promulgating and enforcing policies for the [Jail], providing medical care to inmates and detainees, and operating the jail on a daily basis." *Wirtz v. Regalado*, No. 18-CV-0599-GKF-FHM, 2020 WL 1016445, at *6 (N.D. Okla. Mar. 2, 2020) (citing 19 O.S. § 513 and *Estate of Crowell ex rel. Boen v. Bd. of Cty. Comm'rs of Cleveland Ct*y., 237 P.3d 134, 142 (Okla. 2010)).

4.      All Jail staff, as referenced herein, were, at all times relevant hereto, acting under color of state law and were either employees and/or agents of Defendant Turn Key and/or the TCSO and Sheriff Regalado.

5.      Defendant Board of County Commissioners of Tulsa County ("BOCC" or the "County") is a statutorily created governmental entity.  57 O.S. § 41 provides that "[e]very county, by authority of the board of county commissioners and at the expense of the county, shall have a jail or access to a jail in another county for the safekeeping of prisoners lawfully committed." (emphasis added). BOCC is required to discharge its responsibilities to the Tulsa County Jail in a constitutional and reasonably appropriate manner. BOCC is sued under the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151, *et seq*.[2]

6.      Defendant Dr. Gary Myers was, at all times relevant hereto, an employee and/or agent of Turn Key/the County/TCSO, who was, in part, responsible for overseeing Decedent's health and well-being, including meeting the Decedent's medical and mental health needs, during the time she was in TCSO custody. At all times relevant hereto, Defendant Myers was acting within the scope of his employment and under color of state law. Defendant Myers is sued in his individual capacity.

7.      Defendant Shirley Hadden was, at all times relevant hereto, the Services Administrator for Turn Key at the Jail and an employee and/or agent of Turn Key/the County/TCSO, who was, in part, responsible for overseeing Decedent's health and well-being, including meeting the Decedent's medical and mental health needs, during the time she was in

---

[2]      Pursuant to 51 O.S. § 156, Plaintiff's counsel provided notice to the BOCC of the claims herein on February 27, 2020. The BOCC did not respond to said notice and the same was deemed denied by operation of law on May 27, 2020 pursuant to 51 O.S. § 157. Plaintiff's counsel further provided notice to Turn Key of the claims herein on August 7, 2020. Turn Key did not respond to said notice and the same was deemed denied by operation of law on November 5, 2020 pursuant to 51 O.S. § 157.

TCSO custody. At all times relevant hereto, Defendant Hadden was acting within the scope of her employment and under color of state law. Defendant Hadden is sued in her individual capacity.

8.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eight and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C.§ 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

9.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

10.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

11.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

12. Paragraphs 1-11 are incorporated herein by reference.

### A.  Facts Specific to Decedent's Treatment at the Jail

13.     On or about December 27, 2018, Decedent was arrested and booked into the Tulsa County Jail ("Jail").

14.     Decedent tested positive for Chlamydia on January 23, 2019, while incarcerated at the Jail. It is well-known that having Chlamydia significantly increases the likelihood of developing cervical cancer.[3]

15.     After being diagnosed with Chlamydia, Decedent made her first documented complaint of vaginal discharge to Jail staff on June 22, 2019.

16.     On July 5, 6, and 7, 2019, Decedent submitted repeated requests for medical treatment related to pain she was experiencing in her left hip and thigh.

17.     Decedent was evaluated by Nurse Sellu on July 14, 2019, at which time Nurse Sellu noted that Decedent's left hip pain had begun four (4) weeks earlier. Nurse Sellu also noted that Decedent had been "seen in sick call twice for this issue."

18.     On August 3, 2019, Decedent reported to nursing staff at the Jail that she felt like she had a blood clot in her left thigh.

19.     On August 5, 2019, Decedent was evaluated by Defendant Myers for left hip/groin pain and heavy intermenstrual bleeding. Defendant Myers determined that Decedent was not suffering from deep vein thrombosis ("DVT"). Concerned about her bleeding, Defendant Myers ordered blood work but noted that Decedent was a "healthy menstruating woman with mild anemia."

20.     Anemia is a condition in which a person lacks enough healthy red blood cells to carry adequate oxygen to the body's tissues. Anemia is a common condition in patients suffering from cancer, *especially* cervical cancer patients.[4]

---

[3]      *See, e.g.,* Zhu, Haiyan *et al.*, "Chlamydia Trachomatis Infection-Associated Risk of Cervical Cancer: A Meta-Analysis." *Medicine* Vol. 95,13 (2016).
[4]      *See, e.g.,* Shin, Na-Ri, *et al.*, "Prognostic value of pretreatment hemoglobin level in patients with early cervical cancer." *Obstetrics & gynecology science* vol. 57,1 (2014): 28-36.

21.     On August 10, 2019, Decedent put in another medical request for complaints of continuous vaginal discharge. In response, Nurse Chumley noted that Decedent had already been evaluated multiple times for complaints of irregular vaginal discharge. A culture of the discharge was ordered.

22.     On August 14, 2019, the results of the blood work ordered by Defendant Myers revealed Decedent had leukocytosis, an elevation of the white blood cells indicating sickness. Nonetheless, Defendant Myers noted only that the lab results were normal, and that no follow-up was needed.

23.     On August 15, 2019, the results of the vaginal culture revealed heavy growth of Escherichia Coli ("E. coli"). E. Coli strains possess a plethora of virulence factors that contribute to disease.[5] E. coli is the most common cause of community-acquired urinary tract infections ("UTI"), and a common cause of bacterial vaginosis ("BV").[6]

24.     By August 15, 2019, Defendant Myers and Jail staff were aware of the following regarding Decedent's medical condition:

      a.  She had been diagnosed with Chlamydia;

      b.  She had been complaining of ongoing hip/groin pain for weeks;

      c.  She had been complaining of ongoing, abnormal vaginal discharge for weeks;

      d.  She had been complaining of ongoing, irregular vaginal bleeding for weeks;

      e.  She had mild leukocytosis;

      f.  She had a heavy growth of E. coli; and

---

[5]     *See, e.g.,* Terlizzi, Maria E., *et al.,* "UroPathogenic *Escherichia coli* (UPEC) Infections: Virulence Factors, Bladder Responses, Antibiotic, and Non-antibiotic Antimicrobial Strategies." *Frontiers in microbiology* vol. 8 1566. 15 Aug. 2017.

[6]     *See, e.g.,* Kumar, Nikhil, *et al.,* "Bacterial vaginosis: Etiology and modalities of treatment-A brief note." *Journal of pharmacy & bioallied sciences* vol. 3,4 (2011): 496-503.

g.   Her symptoms were becoming more severe, not less.

25.     Despite these symptoms, Decedent was merely given Tylenol instead of being sent for further evaluation and diagnostic testing.

26.     Decedent made *another* sick call request on August 16, 2019, complaining that she was not menstruating and was experiencing excessive bleeding from her vagina.

27.     Despite continued complaints of irregular vaginal bleeding and discharge, Defendant Myers incorrectly noted on August 20, 2019 that Decedent's complaints had resolved.

28.     Decedent **<u>again</u>** voiced complaints of pain in her lower abdomen with corresponding vaginal discharge on August 24, 2019, just days after Defendant Myers reported it had resolved. Decedent advised that she was also having difficulty with bowel movements at this time.

29.     On August 26, 2019, Decedent had still not been seen by a doctor in response to her August 24, 2019 request and again wrote into the nursing staff stating that she was "sorry for putting a sick call in all the time. ***But there is something wrong with me and I hurt bad***."

30.     Decedent knew that something was not right and was desperate for staff to take her medical needs seriously.

31.     Defendant Myers evaluated Ms. Caddell on August 27, 2019. In his notes from the evaluation, Defendant Myers stated that Decedent "has had frequent sick calls – some of which do not fulfill medical logic."

32.     On September 3, 2019, Defendant Myers refused Decedent's request for more ibuprofen to help with her extreme, and still ongoing pain. Defendant Myers determined at that time that Decedent was  "abusing the [sick call] system."

33.     Defendant Myers continually downplayed Decedent's obvious and apparent serious medical needs. By September 3, 2019, Decedent had been complaining of vaginal bleeding and discharge for months. Any reasonable physician would understand that vaginal bleeding and discharge that lasts for that period of time warrants a more invasive look by an obstetrician. Instead, Defendant Myers wrote Decedent off entirely.

34.     On September 15, 2019, Decedent spoke with Nurse Suzanne who noted that Decedent had been experiencing "menstrual Cycle with blood clots and pain starting 10 months ago." Recognizing how serious Decedent's symptoms were, Nurse Suzanne placed a referral for Decedent to see to an obstetrician.

35.     On September 20, 2019, Defendant Administrator Hadden unilaterally cancelled the referral, advising incorrectly that Decedent had "seen the medical director multiple times without complaint of 'months of heavy bleeding.'"

36.     Despite the months of documented bleeding, including Defendant Myers' diagnosis of anemia, Defendant Hadden informed Defendant Myers that Decedent's "excessive amount of vaginal bleeding needs to be verified before she is tasked to see Dr. Hameed."

37.     Decedent underwent a Complete Blood Count ("CBC") test on September 23, 2019. The results of this testing showed Decedent was experiencing abnormal uterine bleeding and that Decedent's hemoglobin levels had dropped sharply within the previous six (6) weeks.

38.     Decedent was finally seen by an obstetrician, Dr. Aktar Hameed, on September 27, 2019. Dr. Hameed determined that Ms. Caddell's "cervix is friable, irregular, hypertrophied, and with degenerating tissue extending to posterior vaginal vault." He opined Decedent was suffering "probable invasive cancer of the cervix" and ordered a Pap Smear to confirm.

39.     Decedent was evaluated by medical staff at the Jail on October 3, 2019 where she reported experiencing pain levels of "10/10."

40.     On October 6, 2019, the Pap Smear revealed atypical squamous cells.

41.     Rather than have Decedent evaluated immediately so that she could receive treatment for what was very likely cancer, a second Pap Smear was ordered.

42.     On October 30, 2019, Decedent began discharging *tissue* from her vagina, in addition to blood. She had not been back to see Dr. Hameed or any other obstetrician since her October 6, 2019 appointment three weeks earlier. Decedent's condition had gotten so bad by this point that she was soaking through a pad approximately every 20 minutes.

43.     Medical staff at the Jail noted that an "OBGYN will not be in the building until 11/10/19 so due to her symptoms getting worse she was sent out via deputy for further evaluation." Decedent was transferred to Hillcrest Hospital located at 1120 S. Utica Avenue for further evaluation.

44.     Upon arriving, Decedent was administered morphine because of her extreme pain.

45.     After performing a biopsy, the physicians at Hillcrest determined that Ms. Caddell did in fact have squamous cervical carcinoma that was "at least stage 3," and she had extensive necrosis. Her physicians determined that Decedent would need radiation and/or chemotherapy.

46.     Upon learning of the severity of Decedent's diagnosis, Defendants worked swiftly to have Decedent released from custody so that the County and Turn Key would not incur the cost of her cancer treatment. On November 5, 2019, just days after being taken to Hillcrest, Decedent was released from Jail and left to deal with her cancer.

47.     At an appointment at Hillcrest on November 9, 2019, it was discovered that in addition to the cancer, Decedent had also developed DVT in her left leg.[7]

48.     As a result of the DVT diagnosis, Decedent had an Interior Cava ("IVC") Filter placed in her left leg on November 13, 2019.

49.     Decedent fought the cancer for months, undergoing a series of both radiation treatments and chemo-therapy. Eventually, Decedent was taken to the Porta Caeli House (a free facility for the terminally ill), where she remained until she succumbed to the cancer and died on August 16, 2020.

## B. Cervical Cancer

50.     Paragraphs 1-49 are incorporated herein by reference.

51.     Decedent died as a result of cervical cancer that she was exhibiting symptoms of while in the custody and care of the Defendants.

52.     Cervical cancer is the result of infection with one of the known carcinogenic subtypes of the human papillomavirus ("HPV") and is one of the few cancers for which screening has a major impact on prevention. Access to screening and appropriate follow-up of positive tests can eliminate disease in individuals and decrease mortality for populations.[8]

53.     Initial signs and symptoms of cervical cancer include the following: (1) abnormal vaginal bleeding; (2) unusual discharge from the vagina; and (3) pain in the pelvic region.[9]

---

[7]     DVT occurs when a blood clot forms in one or more of the deep veins in a person's body, usually in the legs. DVT can be very serious because blood clots in a person's veins can break loose, travel through the bloodstream and lodge in the lungs, blocking blood flow (a malady known as a pulmonary embolism).

[8]     *See, e.g.,* Kelly PJ, Allison M, Ramaswamy M., (2018) *Cervical cancer screening among incarcerated women*. PLoS ONE 13(6).

[9]     *See, e.g., Cervical Cancer Detection, Diagnosis Staging Sign and Symptoms,* American Cancer Society, last accessed 11/19/20 at https://www.cancer.org/cancer/cervical-cancer/detection-diagnosis-staging/signs-symptoms.html.

54.     Defendants noted that Decedent suffered from abnormal vaginal bleeding as early as August 5, 2019.

55.     Defendants noted that Decedent suffered from unusual vaginal discharge as early June 22, 2019.

56.     Defendants noted that Decedent suffered from pain in her pelvic region as early as July 8, 2019.

57.     Signs and symptoms of a more advanced cervical cancer include: (1) swelling of the legs; (2) problems urinating or having a bowel movement; and (3) blood in the urine.[10]

58.     Defendants noted that Decedent suffered from swelling of her legs as early as August 2, 2019.

59.     Defendants noted that Decedent suffered from problems having bowel movements as early as August 24, 2019.

60.     Decedent repeatedly sought treatment from when she experienced these symptoms. However, the medical apparatus at the Jail grossly failed her.

61.     Defendants should be on alert for the dangers of vaginal health, cervical cancer and the symptoms associated with it, based on the number of female inmates within the Jail.

62.     Women are now the fastest-growing population within America's prison system. Over the past four decades, the number of women in prison has increased by 834% whereas the number of men in prison has increased by less than half of that number.[11]

---

[10]     *See id.*; *see also* Center for Disease Control, *Inside Knowledge 2018 Cervical Cancer Factsheet*, CDC Publication #99-9123, Revised January 2019.

[11]     Wendy Sawyer, *The Gender Divide: Tracking Women's State Prison Growth*, PRISON POL'Y INITIATIVE (Jan. 9, 2018), last accessed 11/19/20 at https://www.prisonpolicy.org/reports/women_overtime.html.

63.     The number of women in Oklahoma's jails has increased more than 20-fold from 1995 through 2015.[12]

64.     According to a June 2018 report by the Prison Policy Initiative ("PPI"), Oklahoma's female incarceration rate has surpassed not only that of every other state in the U.S., but also of almost every other nation.[13]

65.     Defendants should be on alert for the dangers of vaginal health, cervical cancer and the symptoms associated with it, based on how common the disease is within its female inmate population.

66.     Based on nationally representative surveys, women in U.S. jails and prisons have significantly greater odds than the general population of having cervical cancer.[14]

67.      Among the 13,000 new cases of cervical cancer reported each year in the U.S., the rate among women in the criminal justice system is four to five times greater than among non-incarcerated women.[15]

68.     Defendants have a policy of not providing proper access to feminine hygiene products, which have been shown to limit the occurrence of UTIs, HPV, and ultimately cervical cancer.[16] One former Jail inmate reported that Jail staff would refuse to provide feminine hygiene

---

[12]     *Incarceration Trends in Oklahoma*, Vera Institute of Justice December 2019. Last accessed 11/19/20 at https://www.vera.org/downloads/pdfdownloads/state-incarceration-trends-oklahoma.pdf

[13]     *See, e.g.,* Katjstura, Aleks, *States of Women's Incarceration: The Global Context 2019*, Prison Policy Initiative, June 2018.

[14]     Binswanger, Ingrid A et al. "*Risk factors for cervical cancer in criminal justice settings."* Journal of women's health (2002*)* vol. 20,12 (2011).

[15]     Kelly, Patricia J et al. "*Challenges to Pap Smear Follow-up among Women in the Criminal Justice System.*" *Journal of community health* vol. 42,1 (2017): 15-20.

[16]     *See, e.g.,* Maree, Johanna & Wright, Susan. (2007). Sexual and menstrual practices: risks for cervix cancer. Health SA Gesondheid : Journal of Interdisciplinary Health Sciences.

products. The anonymous inmate reported that female inmates at the Jail hold onto feminine hygiene products "like a treasure."[17]

### C.  The Jail's Unconstitutional Health Care Delivery System / Policies and Customs

69.     Paragraphs 1-68 are incorporated herein by reference.

70.     The treatment of Decedent described above constitutes deliberate indifference to her serious medical needs, was conducted in furtherance of and consistent with a) policies, customs, and/or practices for which TCSO and Sheriff Regalado promulgated, created, implemented or possessed responsibility for the continued operation; and b) policies, customs, and/or practices which Turn Key developed and/or had responsibility for implementing.

71.     There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail. Sheriff Regalado has long known of these systemic deficiencies and the substantial risks they pose to inmates, like Decedent, but failed to take reasonable steps to alleviate those deficiencies and risks.

72.     For instance, in August of 2009, the American Correctional Association ("ACA") conducted a "mock audit" of the Jail. The ACA's mock audit revealed that the Jail was non-compliant with "mandatory health standards" and "substantial changes" were suggested. Based on these identified and known "deficiencies" in the health delivery system at the Jail, the Jail Administrator sought input and recommendations from Elizabeth Gondles, Ph.D. ("Dr. Gondles"). Dr. Gondles was associated with the ACA as its medical director/medical liaison. After reviewing pertinent documents, touring the Jail and interviewing medical and correctional personnel, on October 9, 2009, Dr. Gondles generated a Report, entitled "Health Care Delivery Technical

---

[17]      *See, e.g., You Miss So Much When You're Gone*, ACLU, September 2018, https://www.hrw.org/report/2018/09/26/you-miss-so-much-when-youre-gone/lasting-harm-jailing-mothers-trial-oklahoma#_ftn179

Assistance" (hereinafter, "Gondles Report"). The Gondles Report was provided to the Jail Administrator, Michelle Robinette. As part of her Report, Dr. Gondles identified numerous "issues" with the Jail's health care system, as implemented by the Jail's medical services provider ("MSP").[18] After receiving the Gondles Report, Chief Robinette held a conference -- to discuss the Report -- with the Undersheriff, Administrative Captain and the Jail's MSP.

73.     Among the issues identified by Dr. Gondles, as outlined in her Report, were: (a) understaffing of medical personnel due to the MSP's misreporting the average daily inmate population; (b) deficiencies in "doctor/PA coverage"; (c) a lack of health services oversight and supervision; (d) failure to provide new health staff with formal training; (e) delays in inmates receiving necessary medication; (g) nurses failing to document the delivery of health services; (h) systemic nursing shortages; (h) failure to provide timely health appraisals to inmates; and (i) 313 health-related grievances within the past twelve (12) months. Dr. Gondles concluded that "[m]any of the health service delivery issues outlined in this report are a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider." Based on her findings, Dr. Gondles "strongly suggest[ed] that the Jail Administrator establish a central Office Bureau of Health Services" to be staffed by a TCSO-employed Health Services Director ("HSD"). According to Dr. Gondles, without such an HSD in place, TCSO could not properly monitor the competency of the Jail's health staff or the adequacy of the health care delivery system.

74.     Nonetheless, TCSO leadership chose not to follow Dr. Gondles' recommendations. TCSO did not establish a central Office Bureau of Health Services nor hire the "HSD" as recommended. *Id.*

---

[18]     Since the time of Gondles' report, the MSP at the Jail has changed to Turn Key. However, the issues identified have not been remedied or corrected.

75.     The NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

76.     On September 29, 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported its findings in connection with an audit of the Jail's medical system - pertaining to U.S. Immigration and Customs Enforcement ("ICE") detainees -- as follows: "CRCL found a prevailing attitude among clinic staff of indifference"; "Nurses are undertrained. Not documenting or evaluating patients properly."; "Found one case clearly demonstrates a lack of training, perforated appendix due to lack of training and supervision"; "Found two detainees with clear mental/medical problems that have not seen a doctor."; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years".

77.     On November 18, 2011 AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Former Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality." AMS-Roemer specifically commented on no less than six (6) inmate deaths, finding deficiencies in the care provided to each.

78.     It is clear that Former Sheriff Glanz did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail. For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure

to follow NCCHC guidelines "to get patients to providers," and "[n]ot enough training or supervision of nursing staff."

79.     In November 2013, BOCC/TCSO/Former Sheriff Glanz retained Armor Correctional Health Services, Inc. ("Armor") as its private medical provider. However, this step did not alleviate the constitutional deficiencies with the medical system. Medical staffing was still undertrained and inadequately supervised, and inmates were still denied timely and sufficient medical attention. Bad medical and mental health outcomes persisted due to inadequate supervision and training of medical staff, and due to the contractual relationship between BOCC/TCSO/Former Sheriff Glanz and ARMOR (which provided financial disincentives for the transfer of inmates in need of care from an outside facility).

80.     In February 2015 an auditor/nurse hired by Tulsa County/TCSO, Angela Mariani, issued a report focused on widespread failures by ARMOR to abide by its $5 million annual contract with the County. Mariani also wrote three (3) memos notifying TCSO that ARMOR failed to staff various medical positions in the Jail and recommending that the county withhold more than $35,000 in payments. Her report shows that Jail medical staff often failed to respond to inmates' medical needs and that ARMOR failed to employ enough nurses and left top administrative positions unfilled for months. Meanwhile, medical staff did not report serious incidents including inmates receiving the wrong medication and a staff member showing up "under the influence."

81.     In 2016, the County/Sheriff Regalado retained Turn Key as the Jail's medical contractor. Turn Key's CEO, Flint Junod, was Armor's Vice President of the Jail's region during Armor's tenure as the Jail's private medical provider and he was aware of deficiencies in the medical care provided at the Jail prior to and at the time Turn Key was retained.

82.     For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state. Turn Key used its political connections to obtain contracts in a number of counties, including Tulsa County, Muskogee County, Garfield County and Creek County.

83.     To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

84.     There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care.

85.     Under the Contract, Turn Key is responsible to pay the costs of all pharmaceuticals at the Jail. And TCSO/Tulsa County is responsible for the costs of all inmate hospitalizations and offsite medical care. These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail to avoid off-site medical costs.

86.     These financial incentives create risks to the health and safety of inmates like Ms. Caddell who have complex and serious medical needs, such as opioid withdrawal, seizure disorders and heart disease.

87.     Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its

medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs, including opiate withdrawal, heart disease and seizure disorder.

88.     Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

89.     These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs.

90.     Turn Key's corporate policies, practices and customs as described supra, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Ms. Caddell's, a number of which are referenced below:

A.     In June of 2016 an inmate under the care of Turn Key died after being left in a restraint chair for over 48 hours.

B.     In 2016 an inmate was discovered naked, unconscious, and covered in his own feces after having experienced seizure activity at the Jail that went untreated and unaddressed.

C.     An inmate in the Creek County Jail, also under the "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints - - over several days -- of breathing problems were disregarded by responsible staff.

D.     In the summer of 2016, an inmate at the Muskogee County Jail became permanently paralyzed after jail staff failed to provide him treatment after repeated complaints of pain in his back and chest. The inmate had developed an aggressive form of cancer in his back that jail staff refused to treat.

E.     On September 24, 2017, an inmate died in the Tulsa County Jail after Turn Key medical staff provided nonexistent treatment to the inmate for over two weeks despite clear indication of his serious medical condition.

91.     Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs.

92.     Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

93.     These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs, including cervical cancer.

94.     Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

95.     Turn Key's corporate policies, practices and customs as described supra, have resulted in deaths or negative medical outcomes in numerous cases, in addition to the Decedent's.

96.     In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates. And each of these inmates, with obvious, serious and emergent medical conditions, was kept at the jail when they clearly should have been transported to a hospital or another off-site provider capable of assessing and treating the conditions.

97.     By its design, the Turn Key medical system was destined to fail.

98.     Turn Key had a policy, practice or custom of inadequately staffing county jails, including the Tulsa County Jail, with undertrained and underqualified medical personnel who are

ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like the Decedent, with complex and serious medical needs.

99.     This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical conditions, like the Decedent, at substantial risk of harm. This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in Constitutional deprivations.

100.     In a further attempt to minimize costs the Defendants provided substandard care to female inmates like the Decedent by failing to provide proper access to feminine hygiene products. Defendants further failed to offer female inmates' appropriate treatment for vaginal infections including UTIs and HPV.

101.     TCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed female inmates, like Ms. Caddell, at excessive risk of harm. However, TCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like the Decedent.

102.     Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like the Decedent.

103.     In addition, TCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Ms. Caddell, with complex or serious medical needs, with deliberate indifference to the health and safety of those inmates.

<u>**ABSENCE OF FEDERALISM BAR TO**</u>
<u>**MONELL CLAIM AGAINST TURN KEY**</u>

104.     Paragraphs 1-103 are incorporated herein by reference.

105.     The federalism concern that compelled the Monell Court to erect a bar against respondeat superior liability for § 1983 claims against municipal entities has no application to Turn

Key, a private entity. *See* e.g., Shields v. Illinois Dept. of Corrections, 746 F.3d 782, 795 (7th Cir. 2014) ("[A] new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983.")

## CAUSES OF ACTIONS

### FIRST CLAIM FOR RELIEF

FAILURE TO PROVIDE ADEQUATE MEDICAL CARE IN VIOLATION OF THE EIGHTH AND/OR FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES
(42 U.S.C. § 1983)

106.     Paragraphs 1-105 are incorporated herein by reference.

**A.  Underlying Violations of Constitutional Rights/Individual Liability**

107.     The Turn Key/TCSO staff, including Dr. Myers and Shirley Hadden, as described above, knew there was a strong likelihood that the Decedent was in danger of serious harm.

108.     As described supra, the Decedent had serious and emergent medical issues that were known and obvious to the Turn Key/TCSO employees/agents, including Dr. Myers and Shirley Hadden. It was obvious that the Decedent needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and obstructed.

109.     Turn Key/TCSO employees/agents, including Dr. Myers and Shirley Hadden, disregarded the known, obvious and substantial risks to the Decedent's health and safety.

110.     As a direct and proximate result of this deliberate indifference, as described above, the Decedent experienced unnecessary physical pain, a worsening of her condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, medical expenses, and ultimately death.

111.     As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of the Decedent's rights secured by the U.S. Constitution, including punitive damages.

**B. Municipal/"Monell" Liability (Against Turn Key)[19]**

112.     Paragraphs 1-111 are incorporated herein by reference.

113.     Turn Key is a "person" for purposes of 42 U.S.C. § 1983.[20]

114.     At all times pertinent hereto, Turn Key was acting under color of State law.

115.     Turn Key has been endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

116.     Turn Key is charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and has shared responsibility to adequately train and supervise its employees.

117.     In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

118.     There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to the

---

[19]     "A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, see *Monell [v. New York City Dept. of Social Servs*., 436 U.S. 658, 694 (1977), 98S.Ct. 2018], or for an action by an authority with final policy making authority, see *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." *Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Plaintiff's municipal liability claim in this action is based upon a *Monell* theory of liability, thus she need not establish that Turn Key had final policymaking authority for Tulsa County.

[20]     "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits has extended the *Monell* doctrine to private § 1983 defendants." *Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) (emphasis added). *See also Smedley v. Corr. Corp. of Am*., 175 F. App'x 943, 946 (10th Cir. 2005).

Decedent's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key (See, e.g., ¶¶ 69-103, supra).

119.     Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like the Decedent. Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including the Decedent's, serious medical needs.

120.     Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

121.     There is an affirmative causal link between the aforementioned customs, policies, and/or practices and the Decedent's injuries and damages as alleged herein.

122.     Turn Key is also vicariously liable for the deliberate indifference of its employees and agents.

### C.  Official Capacity Liability (Against Sheriff Regalado)

123.     Paragraphs 1-122 are incorporated herein by reference.

124.     The aforementioned acts and/or omissions of TCSO and/or Turn Key staff in being deliberately indifferent to the Decedent's health and safety and violating the Decedent's civil rights are causally connected with customs, practices, and policies which the County/TCSO promulgated, created, implemented and/or possessed responsibility for.

125.     Such policies, customs and/or practices are specifically set forth in paragraphs 58-103, *supra*.

126.     The County/TCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their

known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including the Decedent's, health and safety.

127.    As a direct and proximate result of the aforementioned customs, policies, and/or practices, the Decedent suffered injuries and damages as alleged herein.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES' PROMISE OF EQUAL PROTECTION
### (42 U.S.C. § 1983)

#### As to Defendants Turn Key and Regalado

128.    Paragraphs 1-127 are incorporated herein by reference

129.    Under the Equal Protection Clause of the Fourteenth Amendment, the Decedent had the right to equal access to medical care free from discrimination.

130.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

131.    As a woman, the Decedent was a member of a suspect class and was unlawfully discriminated against because of her sex.

132.    Defendants have a duty under the Eighth Amendment to provide medical care to all inmates in their custody, in a non-discriminatory manner.

133.    Plaintiff was subjected to disparate treatment by Turn Key and/or the TCSO as a result of the Jail's policy, practice, custom, or culture that causes intentional disparate care and outcomes in medical treatment with females housed within the Jail, in stark contrast to the medical treatment of similarly-situated male inmates.

134.    The Defendants' policies and/or practices constituted disparate treatment of females and had a disparate impact on female inmates.

135.    Policies that discriminate by gender must serve important governmental objectives and must be substantially related to achievement of those objectives. *Craig v. Boren,* 429 U.S. 190, 197, (1976).

136.    The Defendants' policies, practices, and customs that result in disparate medical care provided to female inmates have been implemented in an attempt to cut costs. The discriminatory policies and practices serve no legitimate governmental purpose.

137.    The Defendants' discriminatory treatment of female inmates, including the Decedent, was committed knowingly, intentionally, maliciously and/or in reckless disregard of female inmates' rights

138.    As a direct and proximate result of the Defendants' conduct, as described above, the Decedent experienced unnecessary physical pain, a worsening of her condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, medical expenses, and death.

### THIRD CLAIM FOR RELIEF

### Negligence/Wrongful Death

### *As to Defendants Turn Key, Dr. Myers, and Administrator Hadden*

139.    Paragraphs 1-138 are incorporated herein by reference.

140.    Turn Key, Dr. Myers, and Administrator Hadden owed a duty to the Decedent, and all other inmates in custody, to use reasonable care to provide inmates in need of medical attention with appropriate treatment.

141.     Turn Key, Dr. Myers, and Administrator Hadden breached that duty by wholly failing to provide the Decedent with prompt and adequate medical treatment despite repeated requests and obvious need.

142.     Turn Key, Dr. Myers, and Administrator Hadden's breaches of the duty of care include, inter alia: failure to treat Ms. Revilla's serious medical and mental health condition properly; failure to conduct appropriate medical and mental health assessments; failure to create and implement appropriate medical and mental health treatment plans; failure to promptly evaluate Ms. Caddell's physical and mental health; failure to properly monitor Ms. Caddell's physical and mental health; failure to provide access to medical and mental health personnel capable of evaluating and treating her serious health needs; and a failure to take precautions to prevent Ms. Caddell from further injury.

143.     As a direct and proximate cause of Turn Key, Dr. Myers, and Administrator Hadden's negligence, Decedent/Plaintiff experienced physical pain, severe emotional distress, mental anguish, permanent impairment and the damages alleged herein.

144.     As a direct and proximate cause Defendants' negligence, Decedent/Plaintiff has suffered real and actual damages, including medical expenses, mental and physical pain and suffering, emotional distress, death and other damages in excess of $75,000.00.

145.     Turn Key is vicariously liable for the negligence of its employees and agents, including Dr. Myers, and Administrator Hadden.

146.     Turn Key is also directly liable for their own negligence.

**WHEREFORE,** based on the foregoing, Plaintiff prays that this Court grant the relief sought including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of

filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other

relief as is deemed just and equitable.

Respectfully submitted,

SMOLEN | LAW, PLLC


/s/ Donald E. Smolen, II
Donald E. Smolen, II, OBA#19944
Laura L. Hamilton, OBA#22619
Jack Warren, OBA #33635
611 S. Detroit Ave.
Tulsa, OK 74120
P: (918) 777-4LAW (4529)
F: (918) 890-4529
don@smolen.law
laura@smolen.law
jack@smolen.law
*Attorneys for Plaintiff*