**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

(1) YOLANDA LUCAS, as the Special
Administrator of the Estate of MICHELLE
ANN CADDELL, Deceased,

    Plaintiff,

    v.

(1) TURN KEY HEALTH CLINICS, LLC, a
Domestic Limited Liability Corporation;
(2) VIC REGALADO, individually and in his
official capacity as Tulsa County Sheriff;
(3) BOARD OF COUNTY
COMMISSIONERS OF TULSA
COUNTY;
(4) GARY MYERS, MD; AND
(5) SHIRLEY HADDEN,

    Defendants.

20-cv-00601-GKF-CDL

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT**
**GARY MYERS, MD'S MOTION TO DISMISS**

Respectfully submitted,

**SMOLEN | LAW, PLLC**

/s/Dustin J. Vanderhoof
Donald E. Smolen, II, OBA#19944
Laura L. Hamilton, OBA#22619
Dustin J. Vanderhoof, OBA #21388
John Warren, OBA #33635
611 S. Detroit Ave.
Tulsa, OK 74120
P: (918) 777-4LAW (4529)
F: (918) 890-4529
don@smolen.law
laura@smolen.law
dustin@smolen.law
jack@smolen.law
*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITY ........................................................................................ ii

INTRODUCTION ................................................................................................. 1

SUMMARY OF ALLEGATIONS AGAINST DEFENDANT MYERS .......................... 3

STANDARD OF REVIEW .................................................................................... 10

ARGUMENT AND AUTHORITY ......................................................................... 11

 **I.**   **Plaintiff Has Sufficiently Alleged Defendant Myers**
    **Was Deliberately Indifferent to Decedent's Medical Needs.** ......................... 11

    A.   Under a Purely Objective Standard, Plaintiff Sufficiently Alleged
     Defendant Myers' Deliberate Indifference. ................................. 12

    B.   Applying a Subjective Standard, Plaintiff Sufficiently Alleged
     Defendant Myers' Deliberate Indifference. ................................. 17

 **II.**   **Plaintiff Is Not Alleging That Defendant Myers**
    **Is Vicariously Liable.** ......................................................................... 20

 **III.**   **Turn Key and Defendant Myers Are Not Entitled**
    **to Immunity Under the GTCA.** ........................................................ 20

CONCLUSION ................................................................................................... 23

CERTIFICATE OF SERVICE ............................................................................... 24

## <u>TABLE OF AUTHORITY</u>

<u>Cases</u>

*Alderson v. Concordia Parish Corr. Facility*
848 F.3d 415 (5th Cir. 2017) ...................................................................................14

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)..................................................................................................11

*Barrios v. Haskell Cty. Pub. Facilities Auth.*
432 P.3d 233 (Okla. 2018) .................................................................................. 20-22

*Blackmon v. Sutton*
734 F.3d 1237 (10th Cir. 2013) ...............................................................................12

*Bell Atlantic Corp v. Twombly*
550 U.S. 544 (2007)..................................................................................................10

*Bell v. Wolfish*
441 U.S. 520 (1979)..................................................................................................12

*Bruno v. City of Schenectady*
727 Fed. Appx. 717 (2d Cir. 2018) ..................................................................... 13-14

*Buchanan v. Turn Key Health Clinics LLC, et al.*
Case No. CIV-18-171-RAW (E.D. Okla. Feb. 27, 2019)............................................23

*Caiozzo v. Koreman*
581 F.3d 63 (2d Cir. 2009)........................................................................................14

*Canady v. Werholtz*
2004 WL 1212050 (D. Kan. June 1, 2004) ...............................................................15

*Castro v. Cnty. of L.A*
833 F.3d 1060 (9th Cir. 2016) ..................................................................................13

*Cotton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
699 F. Supp. 251 (N.D. Okla. 1988) .........................................................................23

*Currie v. Chhabra*
728 F.3d 626 (7th Cir. 2013) ...................................................................................15

*Dang by & through Dang v. Sheriff, Seminole Cnty.*
871 F.3d 1272 (11th Cir. 2017) ...............................................................................14

*Darnell v. Pineiro*
849 F.3d 17 (2nd Cir. 2017)..............................................................................13-14

*DeSpain v. Uphoff*
264 F.3d 965 (10th Cir. 2001) .................................................................................17

*Duff v. Potter*
665 F. App'x 242 (4th Cir. 2016).............................................................................14

*Durmer v. O'Carroll*
991 F.2d 64 (3rd Cir. 1993) ....................................................................................19

*Farmer v. Brennan*
511 U.S. 825 (1994)................................................................................................18

*Fuller v. Odom*
741 P.2d 449 (Okla. 1987).......................................................................................21

*Gonzalez v. Officer in Charge of Barber Shop on Duty*
2000 WL 274184 (S.D.N.Y. March 13, 2000) ........................................................16

*Gordon v. Cnty. of Orange*
888 F.3d 1118 (9th Cir. 2018) ...........................................................................13-16

*Graham v. Garfield County Criminal Justice Auth.*
Case No. CIV-17-634-SLP (W.D. Okla. March 7, 2019)....................................21-23

*Hathaway v.  Coughlin*
37 F.3d 63 (2nd Cir. 1994) ......................................................................................19

*Hunt v. Uphoff*
199 F.3d 1220 (10th Cir.1999).............................................................................15, 19

*Kansas Penn Gaming, LLC v. Collins*
656 F.3d 1210 (10th Cir. 2011) ...............................................................................11

*Khalik v. United Air Lines*
671 F.3d 1188 (10th Cir. 2012) ...............................................................................11

*Kingsley v. Hendrickson*
576 U.S. 389 (2015)............................................................................................12-15

*Lopez v. LeMaster*
172 F.3d 756 (10th Cir.1999) ..................................................................................12

*Martin v. Bd. of County Com'rs of County of Pueblo*
909 F.2d 402 (10th Cir. 1990) .................................................................................12

*Martinez v. Beggs*
563 F.3d 1082 (10th Cir. 2009) ...............................................................................15

*Mata v. Saiz*
427 F.3d 745 (10th Cir. 2005) ...................................................................... 15, 17-19

*Manuel v. City of Joliet*
137 S. Ct. 911 (2017)...............................................................................................14

*Massachusetts Bay Ins. Co. v. Langager*
2017 WL 3586862 (N.D. Okla. Aug. 18, 2017) ......................................................11

*McElligott v. Foley*
182 F.3d 1248 (11th Cir. 1999) ...............................................................................19

*Miranda v. Cty. of Lake*
900 F.3d 335 (7th Cir. 2018) ....................................................................... 12-13, 15

*Olsen v. Layton Hills Mall*
312 F.3d 1304 (10th Cir. 2002) ...............................................................................12

*Oxendine v. Kaplan*
241 F.3d 1272 (10th Cir. 2001) ...............................................................................19

*Prince v. Turn Key Health Clinics, LLC*
2019 WL 238153 (N.D. Okla. 2019) ........................................................................22

*Revilla v. Glanz*
8 F. Supp. 3d 1336 (N.D. Okla. 2014) ............................................................... 21-23

*Richmond v. Huq*
885 F.3d 928 (6th Cir. 2018) ....................................................................... 13-14

*Rife v. Oklahoma Dep't of Pub. Safety*
854 F.3d 637 (10th Cir. 2017) .................................................................................18

*Sealock v. Colorado*
218 F.3d 1205 (10th Cir. 2000) ...............................................2, 12, 15-16, 18-20

*Strain v. Regalado*
977 F.3d 984 (10th Cir. 2020) .................................................................................12

*Swierkiewicz v. Sorema, N.A.*
534 U.S. 506 (2002).................................................................................................11

*Tafoya v. Salazar*
516 F.3d 912 (10th Cir. 2008) ................................................................................17

*Vogt v. City of Hays, Kansas*
2017 WL 34455 (10th Cir. Jan. 4, 2017) ...............................................................11

*Waldrop v. Evans*
871 F.2d 1030 (11th Cir. 1989) ..............................................................................19

*Whitney v. City of St. Louis*
887 F.3d 857 (8th Cir. 2018) ..................................................................................14

*Wilson v. Seiter*
501 U.S. 294 (1991).................................................................................................14

*Young v. City of Augusta, Ga. Through DeVaney*
59 F.3d 1160 (11th Cir. 1995) ................................................................................19

<u>Statutes</u>

Fed. R. Civ. P. 8(a)(2).............................................................................................10

52 O.S. § 152(7)(b)(7) .............................................................................................21

51 O.S. § 152.1(A) ..................................................................................................21

51 O.S. § 152.1(B) ..................................................................................................21

51 O.S § 153(B) .......................................................................................................21

51 O.S. § 163(C) ......................................................................................................21

<u>Secondary</u>

ACLU
*You Miss So Much When You're Gone*, September 2018
https://www.hrw.org/report/2018/09/26/you-miss-so-much-when-youre-gone/lasting-harm-jailing-mothers-trial-oklahoma#_ftn179.................................................................10

American Cancer Society
*Cervical Cancer Detection, Diagnosis Staging Sign and Symptoms*
https://www.cancer.org/cancer/cervical-cancer/detection-diagnosis-staging/signs-symptoms.html. ........................................................................................8

Binswanger, Ingrid A., *et al*.
"*Risk factors for cervical cancer in criminal justice settings.*"
Journal of Women's Health (2002*) Vol. 20,12 (2011) ...................................................................10

Center for Disease Control
*Inside Knowledge 2018 Cervical Cancer Factsheet*
CDC Publication #99-9123, Revised January 2019 ......................................................................9

Katjstura, Aleks
*States of Women's Incarceration: The Global Context 2019*
Prison Policy Initiative, June 2018 ...............................................................................................9

Kelly, Patricia J., *et al*.
"*Challenges to Pap Smear Follow-up among Women in the Criminal Justice System*."
*Journal of Community Health* Vol. 42, 1 (2017)..........................................................................10

Kelly PJ, Allison M, Ramaswamy M.
*Cervical Cancer Screening Among Incarcerated Women.*
PLoS ONE 13(6)...........................................................................................................................8

Kumar, Nikhil, *et al.*
"Bacterial Vaginosis: Etiology and Modalities of Treatment – a Brief Note."
*Journal of Pharmacy & Bioallied Sciences* Vol. 3, 4 (2011) ........................................................5

Maree, Johanna & Wright, Susan
Sexual and Menstrual Practices: Risks for Cervix Cancer.
Health SA Gesondheid: Journal of Interdisciplinary Health Sciences ..........................................10

Shin, Na-Ri, *et al.*
"Prognostic Value of Pretreatment Hemoglobin Level in Patients with Early Cervical Cancer."
*Obstetrics & Gynecology Science* Vol. 57, 1 (2014).....................................................................4

Terlizzi, Maria E., *et al.*
"UroPathogenic *Escherichia Coli* (UPEC) Infections: Virulence Factors, Bladder Responses,
Antibiotic, and Non-Antibiotic Antimicrobial Strategies."
*Frontiers in Microbiology* Vol. 8, 1566 (2017).............................................................................4

Vera Institute of Justice
*Incarceration Trends in Oklahoma* (Dec. 2019)
https://www.vera.org/downloads/pdfdownloads/state-incarceration-trends-oklahoma.pdf ............9

Wendy Sawyer
*The Gender Divide: Tracking Women's State Prison Growth*
PRISON POL'Y INITIATIVE (Jan. 9, 2018)
https://www.prisonpolicy.org/reports/women_overtime.html.........................................................9

Zhu, Haiyan, *et al.*
"Chlamydia Trachomatis Infection-Associated Risk of Cervical Cancer: A Meta-Analysis."
*Medicine* Vol. 95, 13 (2016) ............................................................................................3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) YOLANDA LUCAS, as the Special
Administrator of the Estate of MICHELLE
ANN CADDELL, Deceased,

    Plaintiff,

    v.

(1) TURN KEY HEALTH CLINICS, LLC, a
Domestic Limited Liability Corporation;
(2) VIC REGALADO, individually and in his
official capacity as Tulsa County Sheriff;
(3) BOARD OF COUNTY
COMMISSIONERS OF TULSA
COUNTY;
(4) GARY MYERS, MD; AND
(5) SHIRLEY HADDEN,

    Defendants.

20-cv-00601-JFH-CDL

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
## GARY MYERS, MD'S MOTION TO DISMISS

COMES NOW the Plaintiff, Yolanda Lucas, as the Special Representative of the Estate of

Michelle Ann Caddell, by and through her attorneys of record, and hereby submits her response in

opposition to Defendant Gary Myers, M.D.'s Motion to Dismiss [Dkt. # 22]. Plaintiff has

sufficiently alleged plausible civil rights violations for Defendant Myers' deliberate indifference

to Michelle Ann Caddell's serious medical needs, including obvious and severe symptoms of

worsening cervical cancer. This Court should deny Defendant Myers' motion to dismiss.  In

support, Plaintiff states the following:

## INTRODUCTION

This case arises out of the tragic and horrific medical indifference experienced by Michelle

Ann Caddell ("Decedent") as a pretrial detainee at the David L. Moss Criminal Justice Center (the

"Jail").  Shortly after being booked into the Jail, Decedent was diagnosed with chlamydia, a disease known to significantly increase the likelihood of developing cervical cancer. From that point on, for *months*, the Jail's medical staff, including Defendant Myers, ignored and downplayed Decedent's emergent medical symptoms indicative of cervical cancer. Despite her intense, unbearable pain and irregular bleeding, staff, including Defendant Myers, failed to provide Decedent the obvious medical care necessary to detect and treat cancer. ***Instead, they accused Decedent of abusing the Jail's sick call systems***. Ultimately, Defendant Myers and Jail medical staff delayed Decedent's treatment until her cancer had uncontrollably spread and ravaged her body, before ultimately having Decedent released on her own recognizance so the County would not have to pay for treatment. Without a few months of her release, Decedent succumbed to the cancer and died. As discussed herein, without question Defendant Myers was a "gatekeeper for other medical personnel capable of" detecting and treating Decedent's cancer; however, he "delay[ed] [and] refuse[d] to fulfill that gatekeeper role" and was therefore deliberately indifferent to Decedent's medical needs under clearly established legal precedent. *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000)).

On November 23, 2020, Plaintiff filed her Complaint (Dkt. #2), setting forth specific, highly detailed, and thorough allegations supporting the constitutional and state law claims brought against Defendants, including Defendant Myers. The Complaint is twenty-seven (27) pages in length and includes one-hundred and forty-six (146) paragraphs of substantive content. As detailed in the Complaint, Michelle Ann Caddell ("Decedent") experienced tragic and appalling indifference by the responsible medical staff employed by Turn Key at the Jail, including Defendant Myers.  As further detailed in the Complaint, Turn Key employees, including Defendant Myers, disregarded known, obvious and substantial risks to Decedent's health and safety. Due to

their indifference, Decedent needlessly suffered from a delay in treating her cervical cancer and ultimately passed away as a result.

In response to Plaintiff's well-plead Complaint, Defendant Defendant Myers has moved to dismiss, arguing: 1) that Plaintiff has not sufficiently pled that Defendant Myers was deliberately indifferent and thus there was no constitutional violation; and 2) Plaintiff cannot bring a negligence claim against Defendant Myers under the Oklahoma Governmental Tort Claims Act (the "GTCA"). However, Plaintiff's Complaint clearly sets out, in painstaking detail, Defendant Myers' indifference to Decedent's obvious and emergent medical problem. Further, the GTCA does not apply to a private entity like Turn Key nor does it apply to protect Turn Key's employees. This Court should therefore deny Defendant Myers' Motion to Dismiss in its entirety.

## SUMMARY OF ALLEGATIONS AGAINST DEFENDANT MYERS

The following facts from Plaintiff's Complaint plainly set out Defendant Myers' deliberate indifference to Plaintiff:

1. On or about December 27, 2018, Decedent was arrested and booked into the Tulsa County Jail ("Jail"). *See* Dkt. #2 at ¶ 13.

2. Decedent tested positive for chlamydia on January 23, 2019, while incarcerated at the Jail. *See id.* at ¶ 14.

3. It is well-known that having chlamydia significantly increases the likelihood of developing cervical cancer.[1] *See id.*

4. After being diagnosed with chlamydia, Decedent made her first documented complaint of vaginal discharge to Jail staff on June 22, 2019. *See id.* at ¶ 15.

5. On July 5, 6, and 7, 2019, Decedent submitted repeated requests for medical treatment related to pain she was experiencing in her left hip and thigh. *See id.* at ¶ 16.

6. On July 14, 2019, seven days after her medical request regarding her pain in her left hip, Decedent was evaluated by Nurse Sellu. During the evaluation, Nurse Sellu

---

[1] *See, e.g.,* Zhu, Haiyan *et al.*, "Chlamydia Trachomatis Infection-Associated Risk of Cervical Cancer: A Meta-Analysis." *Medicine* Vol. 95,13 (2016). *Cited in the Complaint at XXX.*

noted that Decedent's left hip pain had begun four (4) weeks earlier. Nurse Sellu also noted that Decedent had been "seen in sick call twice for this issue." *See id.* at ¶ 17.

7.      A couple of weeks later, on August 3, 2019, Decedent again reported to the Jail nursing staff that she felt like she had a blood clot or similar issue in her left thigh. *See id.* at ¶ 18

8.      On August 5, 2019, Defendant Myers evaluated Decedent for left hip/groin pain and noted heavy intermenstrual bleeding. Defendant Myers determined that Decedent was not suffering from deep vein thrombosis ("DVT"). Regarding her heavy intermenstrual bleeding, Defendant Myers ordered blood work but decided to note that Decedent was a "healthy menstruating woman with mild anemia." *See id.* at ¶ 19.

9.      Anemia is a condition in which a person lacks enough healthy red blood cells to carry adequate oxygen to the body's tissues. Anemia is a common condition in patients who have cancer, ***especially cervical cancer patients***.[2] *See id.* at ¶ 20.

10.     On August 10, 2019, Decedent put in another medical request for complaints of continuous vaginal discharge. In response, Nurse Chumley noted that Decedent had already been evaluated multiple times for complaints of irregular vaginal discharge. A culture of the discharge was ordered. *See id.* at ¶ 21.

11.     On August 14, 2019, the results of the blood work ordered by Defendant Myers revealed Decedent had leukocytosis, an elevation of the white blood cells indicating sickness. ***Nonetheless, Defendant Myers decided to note incorrectly that the lab results were "normal" and that no follow-up was needed***. *See id.* at ¶ 22.

12.     On August 15, 2019, the results of the vaginal culture revealed heavy growth of Escherichia Coli ("E. coli"). E. Coli strains possess a plethora of virulence factors that contribute to disease.[3] E. coli is the most common cause of community-

---

[2]      *See, e.g.,* Shin, Na-Ri, *et al.*, "Prognostic value of pretreatment hemoglobin level in patients with early cervical cancer." *Obstetrics & Gynecology Science* vol. 57,1 (2014): 28-36 (*Cited in* the Complaint, Dkt. 2 at n. 3).

[3]      *See, e.g.,* Terlizzi, Maria E., *et al.,* "UroPathogenic *Escherichia coli* (UPEC) Infections: Virulence Factors, Bladder Responses, Antibiotic, and Non-antibiotic Antimicrobial Strategies." *Frontiers in Microbiology* vol. 8 1566. 15 Aug. 2017(*Cited in* the Complaint, Dkt. 2 at n. 5).

acquired urinary tract infections ("UTI"), and a common cause of bacterial vaginosis ("BV").[4] *See id.* at ¶ 23.

13. **By August 15, 2019, Defendant Myers and Jail staff were aware of the following regarding Decedent's medical condition:**

 ❖ **She had been diagnosed with chlamydia;**

 ❖ **She had been complaining of ongoing hip/groin pain for weeks;**

 ❖ **She had been complaining of ongoing, abnormal vaginal discharge for weeks;**

 ❖ **She had been complaining of ongoing, irregular vaginal bleeding for weeks;**

 ❖ **She had leukocytosis;**

 ❖ **She had a heavy growth of E. coli; and**

 ❖ **Her symptoms were becoming *more* severe, not less**. *See id.* at ¶ 24.

14. Despite the severity of these symptoms and diagnoses, Jail medical staff, under the supervision of Defendant Myers, merely gave Decedent Tylenol and did not provide Decedent access to further evaluation and diagnostic testing. *See id.* at ¶ 25.

15. On August 16, 2019, Decedent made *another* sick call request. Decedent notified medical staff that she was not menstruating and yet was experiencing excessive bleeding from her vagina. *See id.* at ¶ 26.

16. ***Despite continued complaints of irregular vaginal bleeding and discharge, Defendant Myers incorrectly noted on August 20, 2019 that Decedent's complaints had resolved***. *See id.* at ¶ 27.

17. On August 24, after Defendant Myers recklessly noted that Decedent's complaints had resolved, Decedent **again** voiced complaints of pain in her lower abdomen with corresponding vaginal discharge. Decedent also advised that she was also having difficulty with bowel movements. *See id.* at ¶ 28.

18. On August 26, 2019, when a doctor had seen Decedent in response to her August 24, 2019 request, Decedent again begged for help with her pain and other symptoms. Decedent wrote into the Jail medical staff stating that she was "sorry

---

[4]     *See, e.g.,* Kumar, Nikhil, *et al*., "Bacterial vaginosis: Etiology and modalities of treatment- A brief note." *Journal of Pharmacy & Bioallied Sciences* vol. 3,4 (2011): 496-503(*Cited in* the Complaint, Dkt. 2 at n. 6).

for putting a sick call in all the time. ***But there is something wrong with me and I hurt bad***." *See id.* at ¶ 29.

19.    Decedent knew that something was not right and was desperate for Jail medical staff and Defendant Myers to take her medical needs seriously. *See id.* at ¶ 30.

20.    Defendant Myers finally evaluated Decedent on August 27, 2019.  In his notes from the evaluation, Defendant Myers stated that ***Decedent "has had frequent sick calls – some of which do not fulfill medical logic." See id.*** at ¶ 31.

21.    On September 3, 2019, Defendant Myers, the gatekeeper to Decedent's proper medical care, refused Decedent's request for more ibuprofen to help with her extreme and still ongoing pain. ***Defendant Myers recklessly determined at that time that Decedent was "abusing the [sick call] system." See id.*** at ¶ 32.

22.     Defendant Myers continually downplayed and ignored Decedent's obvious and apparent serious medical needs. By September 3, 2019, Decedent had been complaining of vaginal bleeding and discharge for months. Any reasonable physician would understand that vaginal bleeding and discharge that lasts for that period of time warrants a more invasive look by an obstetrician. Instead, Defendant Myers wrote Decedent off entirely ***and actually accused Decedent of abusing sick calls***. *See id.* at ¶ 33.

23.    On September 15, 2019, Decedent spoke with Nurse Suzanne, who noted that Decedent had been experiencing "menstrual Cycle with blood clots and pain starting 10 months ago." Recognizing how severe Decedent's symptoms were, Nurse Suzanne finally placed a referral for Decedent to see an obstetrician. *See id.* at ¶ 34.

24.    On September 20, 2019, ***Defendant Administrator Hadden unilaterally canceled the referral, incorrectly advising that Decedent had "seen the medical director multiple times without complaint of 'months of heavy bleeding.'"*** *See id.* at ¶ 35.

25.    Despite the months of documented bleeding, including Defendant Myers' diagnosis of anemia, Defendant Hadden advised Defendant Myers that Decedent's "excessive amount of vaginal bleeding needs to be verified before she is tasked to see Dr. Hameed." *See id.* at ¶ 36.

26.    Defendant Myers agreed with Defendant Hadden's assessment and did not reschedule Decedent's appointment at that time. *See id.* at ¶¶ 36-37.

27.    Decedent underwent a Complete Blood Count ("CBC") test on September 23, 2019. The results of this testing showed Decedent was experiencing abnormal uterine bleeding and that Decedent's hemoglobin levels had dropped sharply within the previous six (6) weeks. *See id.* at ¶ 37.

28.    Decedent was finally seen by an obstetrician, Dr. Aktar Hameed, on September 27, 2019. Dr. Hameed determined that Ms. Caddell's "cervix is friable, irregular,

hypertrophied, and with degenerating tissue extending to posterior vaginal vault." He opined Decedent was suffering "probable invasive cancer of the cervix" and ordered a Pap Smear to confirm. *See id.* at ¶ 38.

29.    Jail medical staff evaluated Decedent on October 3, 2019, where she reported experiencing pain levels of "10/10." *See id.* at ¶ 39.

30.    On October 6, 2019, the Pap Smear revealed atypical squamous cells confirming the presence of cancer. *See id.* at ¶ 40.

31.    Rather than have Decedent immediately evaluated to begin cancer treatment, a second Pap Smear was ordered ***but never actually obtained by the Medical Staff***. *See id.* at ¶ 41.

32.    On October 30, 2019, twenty-four (24) days after her irregular Pap Smear result, in addition to her excessive bleeding and extreme pain, Decedent began discharging *tissue* from her vagina. Jail medical staff had not permitted her to see Dr. Hameed or any other obstetrician since her October 6, 2019 appointment three weeks earlier. Decedent's condition had gotten so bad by this point that she was soaking through a pad approximately every 20 minutes. *See id.* at ¶ 42

33.    On October 30, 2019, staff noted that an "OBGYN will not be in the building until 11/10/19 so due to her symptoms getting worse she was sent out via deputy for further evaluation." Decedent was transferred to Hillcrest Hospital located at 1120 S. Utica Avenue ("Hillcrest") for further evaluation. *See id.* at ¶ 43.

34.    Upon arriving, the Hillcrest medical staff administered morphine to Decedent because of her extreme pain. *See id.* at ¶ 44.

35.    After performing a biopsy, the physicians at Hillcrest determined that Decedent did, in fact, have squamous cervical carcinoma that was "at least stage 3," ***and also diagnosed her with extensive necrosis***. Her physicians decided that Decedent would need radiation and chemotherapy. *See id.* at ¶ 45

36.    Upon learning of the severity of Decedent's diagnosis, Defendants worked swiftly to have Decedent released from custody so that Tulsa County and Turn Key would not incur the cost of Decedent's cancer treatment. On November 5, 2019, just days after being taken to Hillcrest, Decedent was released from Jail and left to deal with her cancer. *See id.* at ¶ 46.

37.    At an appointment at Hillcrest on November 9, 2019, it was discovered that in addition to cancer, Decedent had also developed DVT in her left leg.[5] *See id.* at ¶ 47.

---

[5]    DVT occurs when a blood clot forms in one or more of the deep veins in a person's body, usually in the legs. DVT can be very serious because blood clots in a person's veins can break

38.     As a result of the DVT diagnosis, Decedent had an Interior Cava ("IVC") Filter placed in her left leg on November 13, 2019. *See id.* at ¶ 48.

39.     Decedent fought the cancer for months, undergoing a series of both radiation treatments and chemotherapy. Eventually, Decedent was taken to the Porta Caeli House (a free facility for the terminally ill), where she remained until she succumbed to finally succumbed to cancer and died on August 16, 2020. *See id.* at ¶ 49.

In addition to the above allegations specific to Decedent, Plaintiff has made many allegations regarding the Jail's (and Defendant Myers') treatment, evaluation, and prevention of cervical cancer in any and all of the inmates/pretrial detainees entrusted to their care:

1.      Decedent died as a result of cervical cancer that she was exhibiting symptoms of while in the Defendants' custody and care. *See id.* at ¶ 51.

2.      Cervical cancer results from infection with one of the known carcinogenic subtypes of the human papillomavirus ("HPV"). It is one of the few cancers for which screening has a significant impact on prevention. Access to screening and appropriate follow-up of positive tests can eliminate the disease in individuals and decrease mortality for populations.[6] *See id.* at ¶ 52.

3.      Initial signs and symptoms of cervical cancer include the following: (1) abnormal vaginal bleeding; (2) unusual discharge from the vagina; and (3) pain in the pelvic region.[7] *See id.* at ¶ 53.

4.      Defendants noted that Decedent suffered from abnormal vaginal bleeding as early as August 5, 2019. *See id.* at ¶ 54.

5.      Defendants noted that Decedent suffered from unusual vaginal discharge as early June 22, 2019. *See id.* at ¶ 55.

6.      Defendants noted that Decedent suffered from pain in her pelvic region as early as July 8, 2019. *See id.* at ¶ 56.

---

loose, travel through the bloodstream and lodge in the lungs, blocking blood flow (a disorder known as a pulmonary embolism).

[6]     *See, e.g.,* Kelly PJ, Allison M, Ramaswamy M., (2018) *Cervical cancer screening among incarcerated women*. PLoS ONE 13(6) (*Cited in* the Complaint, Dkt. 2 at n. 8).

[7]     *See, e.g., Cervical Cancer Detection, Diagnosis Staging Sign and Symptoms,* American Cancer Society, last accessed 11/19/20 at https://www.cancer.org/cancer/cervical-cancer/detection-diagnosis-staging/signs-symptoms.html (*Cited in* the Complaint, Dkt. 2 at n. 9).

7.    Signs and symptoms of a more advanced cervical cancer include: (1) swelling of the legs; (2) problems urinating or having a bowel movement; and (3) blood in the urine.[8] *See id.* at ¶ 57.

8.    Defendants noted that Decedent suffered from swelling of her legs as early as August 2, 2019. *See id.* at ¶ 58.

9.    Defendants noted that Decedent suffered from problems having bowel movements as early as August 24, 2019. *See id.* at ¶ 59.

10.   Decedent repeatedly sought treatment from when she experienced these symptoms. However, the medical apparatus at the Jail grossly failed her.  *See id.* at ¶ 60.

11.   Defendants should be on alert for the dangers of vaginal health, cervical cancer, and its associated symptoms, based on the number of female inmates within the Jail. *See id.* at ¶ 61.

12.   Women are now the fastest-growing population within America's prison system. Over the past four decades, the number of women in prison has increased by 834%, whereas the number of men in prison has increased by less than half of that number.[9] *See id.* at ¶ 62.

13.   The number of women in Oklahoma's jails has increased more than 20-fold from 1995 through 2015.[10] *See id.* at ¶ 63.

14.   According to a June 2018 report by the Prison Policy Initiative ("PPI"), Oklahoma's female incarceration rate has surpassed not only that of every other state in the U.S., but also of almost every other nation.[11] *See id.* at ¶ 64.

---

[8]    *See id*.; *see also* Center for Disease Control, *Inside Knowledge 2018 Cervical Cancer Factsheet*, CDC Publication #99-9123, Revised January 2019. (*Cited in* the Complaint, Dkt. 2 at n. 10).

[9]    Wendy Sawyer, *The Gender Divide: Tracking Women's State Prison Growth*, PRISON POL'Y INITIATIVE (Jan. 9, 2018), last accessed 11/19/20 at https://www.prisonpolicy.org/reports/women_overtime.html. (*Cited in* the Complaint, Dkt. 2 at n. 11).

[10]   *Incarceration Trends in Oklahoma*, Vera Institute of Justice December 2019. Last accessed 11/19/20 at https://www.vera.org/downloads/pdfdownloads/state-incarceration-trends-oklahoma.pdf (*Cited in* the Complaint, Dkt. 2 at n. 12)..

[11]   *See, e.g.,* Katjstura, Aleks, *States of Women's Incarceration: The Global Context 2019*, Prison Policy Initiative, June 2018 (*Cited in* the Complaint, Dkt. 2 at n. 13).

15. Defendants should be on alert for the dangers of vaginal health, cervical cancer, and the symptoms associated with it, based on how common the disease is within its female inmate population. *See id.* at ¶ 65.

16. Based on nationally representative surveys, women in U.S. jails and prisons have significantly greater odds than the general population of having cervical cancer.[12] *See id.* at ¶ 66.

17. Among the 13,000 new cases of cervical cancer reported each year in the U.S., the rate among women in the criminal justice system is four to five times greater than among non-incarcerated women.[13] *See id.* at ¶ 67.

18. Defendants have a policy of not providing proper access to feminine hygiene products, which have been shown to limit the occurrence of UTIs, HPV, and ultimately cervical cancer:[14] one former Jail inmate reported that Jail staff would refuse to provide feminine hygiene products; the anonymous inmate reported that female inmates at the Jail hold onto feminine hygiene products "like a treasure."[15] *See id.* at ¶ 68.

## STANDARD OF REVIEW

Federal pleading rules require only that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose is to "give the defendant fair notice of what the …claim is and the grounds upon which it rests." *Bell*

---

[12] Binswanger, Ingrid A et al. "*Risk factors for cervical cancer in criminal justice settings.*" Journal of women's health (2002*)* vol. 20,12 (2011) (*Cited in* the Complaint, Dkt. 2 at n. 14).

[13] Kelly, Patricia J et al. "*Challenges to Pap Smear Follow-up among Women in the Criminal Justice System.*" *Journal of community health* vol. 42,1 (2017): 15-20 (*Cited in* the Complaint, Dkt. 2 at n. 15).

[14] *See, e.g.,* Maree, Johanna & Wright, Susan. (2007). Sexual and menstrual practices: risks for cervix cancer. Health SA Gesondheid : Journal of Interdisciplinary Health Sciences (*Cited in* the Complaint, Dkt. 2 at n. 16).

[15] *See, e.g., You Miss So Much When You're Gone*, ACLU, September 2018, https://www.hrw.org/report/2018/09/26/you-miss-so-much-when-youre-gone/lasting-harm-jailing-mothers-trial-oklahoma#_ftn179 (*Cited in* the Complaint, Dkt. 2 at n. 17).

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).[16] A pleading states a claim for relief where the allegations, taken as true, set forth a claim that is "plausible on its face." *Id*. at 570. In making that determination, the Court must accept all well-pleaded allegations as true, even if doubtful, and must construe the allegations most favorably to the Plaintiff. *See, e.g., Massachusetts Bay Ins. Co. v. Langager,* 2017 WL 3586862, *1 (N.D. Okla. Aug. 18, 2017) (citing *Twombly,* 550 U.S. at 555). A claim is "facially plausible" if it has "enough factual content to allow 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Vogt v. City of Hays, Kansas*, 2017 WL 34455, *2 (10th Cir. Jan. 4, 2017), quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "'Asking for plausible grounds…does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence [supporting the claim].'" *Massachusetts Bay,* 2017 WL 3586862 at * 2, quoting *Twombly,* 550 U.S. at 556. A well-pleaded Complaint may proceed "'even if it strikes a savvy judge that actual proof of those facts is improbable and that recovery is very remote and unlikely.'" *Id*., quoting *Twombly*, 550 U.S. at 556.

The allegations against Defendant Myers contained in the Amended Complaint easily meet the *Twombly* "plausibility" standard.

## ARGUMENT AND AUTHORITY

I.    **Plaintiff Has Sufficiently Alleged Defendant Myers Was Deliberately Indifferent to Decedent's Medical Needs.**

---

[16]    Following *Twombly*, there was discussion in the federal courts of whether the decision imposed a heightened pleading standard on plaintiffs. *See, e.g., Khalik v. United Air Lines,* 671 F.3d 1188, 1191 (10th Cir. 2012) (comparing cases) ("There is disagreement as to whether this new standard requires minimal change or whether it in fact requires a significantly heightened fact-pleading standard."). The Tenth Circuit has expressly ***rejected*** the argument that *Twombly* requires heightened fact pleading. *Id*. (emphasis added) citing *Iqbal*, 129 S.Ct. at 1950; *see also Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 514 (2002). Rather than imposing a heightened standard, the Tenth Circuit has interpreted *Twombly* as "refining" notice pleading. *Id.,* citing *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

Although "neither prison officials nor municipalities can absolutely guarantee the safety of their prisoners, [t]hey are ... responsible for taking reasonable measures to [e]nsure the safety of inmates." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir.1999) (internal citation omitted). Pretrial detainees, like Decedent, who have not been convicted of a crime, have a constitutional right to medical and psychiatric care under the Due Process Clause of the Fourteenth Amendment "at least [at] the same standard of care prison officials owe convicted inmates." *Blackmon*, 734 F.3d at 1244 (emphasis added); *see also Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Martin v. Bd. of County Com'rs of County of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990).

A.    **Under a Purely Objective Standard, Plaintiff Sufficiently Alleged Defendant Myers' Deliberate Indifference.**

Under the traditional analysis, "[d]eliberate indifference involves both an objective and subjective component." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)) (internal quotation marks omitted). However, more recent caselaw indicates that the Fourteenth Amendment rights of pretrial detainees, like Decedent, should be analyzed under a purely objective standard.[17] *See, e.g., Kingsley v. Hendrickson*, 576 U.S. 389, 396-97, 135 S. Ct. 2466, 2473 (2015) (held that a pretrial detainee's Fourteenth Amendment excessive force claim need only meet the objective component

---

[17]    Plaintiff acknowledges that the Tenth Circuit recently held that a plaintiff alleging deliberate indifference to a pretrial detainee's medical needs must establish both objective *and subjective* indifference. *See, Strain v. Regalado*, 977 F.3d 984 (10th Cir. 2020). However, Plaintiff disagrees with the holding and informs this Court, as stated by the Seventh Circuit in *Miranda v. Cty. of Lake*, 900 F.3d 335, 351-52 (7th Cir. 2018), there is a split on this issue in the circuit courts. There is currently a pending petition for certiorari on this issue filed with the Supreme Court in recognition of this split of authority. *See Dart v. Mays*, No. 20-990, Petition for Writ of Certiorari filed on Jan. 15, 2021, attached hereto as Exhibit 1. Plaintiff respects the Tenth Circuit's *Strain* decision but is preserving her argument in light of the split of authority among the circuits and the pending petition for writ of certiorari.

by showing that "the force purposely or knowingly used against him was objectively unreasonable."). And several federal circuit courts have applied *Kingsley*'s objective standard in medical care claims brought by pretrial detainees under the Fourteenth Amendment. *See, e.g., Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (extending *Kingsley* to medical care claims brought by pretrial detainees under the Fourteenth Amendment); *Miranda*, 900 F.3d at 352 ("We … conclude, along with the Ninth and Second Circuits, that medical care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*."); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2nd Cir. 2017) (applying the objective standard to detainees' Fourteenth Amendment complaints about their conditions of confinement; in the process, it overruled a decision applying a subjective test to a medical-care claim); *Bruno v. City of Schenectady*, 727 Fed. Appx. 717, 720 (2d Cir. 2018) (unpublished) (in a medical care case, asking "whether a 'reasonable person' would appreciate the risk to which the detainee was subjected"); *See also Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018) (relying on *Kingsley* for the observation that "this shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether Richmond need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them.").

As discussed by the well-reasoned cases above, this Court should apply the *Kingsley* standard in this case involving medical-need claims of a pretrial detainee. As the Seventh Circuit held and persuasively reasoned in *Miranda*:

> Though *Kingsley*'s direct holding spoke only of excessive-force claims, two of our sister circuits have held that its logic is not so constrained. The Ninth Circuit first extended *Kingsley*'s objective inquiry to detainees' Fourteenth-Amendment failure-to-protect claims. *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070–71 (9th Cir. 2016) (*en banc*), *cert. denied*, —— U.S. ——, 137 S. Ct. 831, 197 L.Ed.2d 69 (2017). Since then, that court has applied the *Kingsley* holding more broadly to a

medical-need claim brought by a pretrial detainee. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018). The Second Circuit followed suit, applying the objective standard to detainees' Fourteenth-Amendment complaints about their conditions of confinement; in the process, it overruled a decision applying a subjective test to a medical-care claim. *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017) (overruling *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009)); see *Wilson*, 501 U.S. at 303, 111 S. Ct. 2321 (medical care is a condition of confinement). Later, the Second Circuit expressly applied an objective standard to a claim of deliberate indifference to a serious medical condition. *Bruno v. City of Schenectady*, 727 Fed. Appx. 717, 720 (2d Cir. 2018) (unpublished) (asking "whether a 'reasonable person' would appreciate the risk to which the detainee was subjected"). Other courts of appeals have contemplated the same reading of *Kingsley*. *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018) (not applying *Kingsley*, which neither party raised, but recognizing the "shift in Fourteenth Amendment deliberate indifference jurisprudence [that] calls into serious doubt whether [the plaintiff] need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them").

The Eighth, Eleventh, and Fifth Circuits have chosen to confine *Kingsley* to its facts—that is, to Fourteenth-Amendment claims based on excessive-force allegations in a pretrial setting. *E.g.*, *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018); *Dang by & through Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017); *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (following circuit precedent and concluding that the issue was not directly raised). It is worth noting, however, that a concurring judge in *Alderson* advocated reconsideration of the subjective standard to detainees' other claims in light of *Kingsley*. *Id.* at 424–25 (Graves, J., specially concurring in part).

Some circuits have continued to analyze inadequate medical treatment claims under the deliberate indifference standard without grappling with the potential implications of *Kingsley*. *E.g.*, *Duff v. Potter*, 665 F. App'x 242, 244–45 (4th Cir. 2016) (applying the objective reasonableness standard to a detainee's excessive-force claim but not his medical-need claim, which it affirmed on forfeiture grounds).

We have not yet expressly weighed in on the debate. . . . Because the answer may make a difference in the retrial of Gomes's claims, we think it appropriate to address the proper standard at this time. We begin with the fact that the Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees. In this respect, *Kingsley* does not stand alone. *See, e.g.*, *Manuel v. City of Joliet*, ─── U.S. ───, 137 S. Ct. 911, 197 L.Ed.2d 312 (2017) (allowing Fourth Amendment challenges to pretrial detention even beyond the start of legal process). The court has cautioned that the Eighth Amendment and Due Process analyses are not coextensive. *See Kingsley*, 135 S. Ct. at 2475 ("The

language of the two Clauses differs, and the nature of the claims often differs."); *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013) ("[D]ifferent constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody."). We see nothing in the logic the Supreme Court used in *Kingsley* that would support this kind of dissection of the different types of claims that arise under the Fourteenth Amendment's Due Process Clause. To the contrary, the Court said that "[t]he language of the [Eighth and Fourteenth Amendments] differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" 135 S.Ct. at 2475 (citations omitted). We thus conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*.

*Miranda*, 900 F.3d at 351–52. Conditions of confinement actions, including the right to adequate medical care claims, brought by pretrial detainees, "***must*** be evaluated under an objective deliberate indifference standard." *Gordon,* 888 F.3d at 1125 (emphasis added).

Under an objective analysis, "the test is met if the harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause' of the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Further, "it is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely 'the symptoms presented at the time the prison employee had contact with the prisoner.'" *Martinez*, 563 F.3d at 1088 (quoting Mata v. Saiz, 427 F.3d 745, 752–53 (10th Cir. 2005)).  A medical need is sufficiently serious "'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir.1999)). Cancer is sufficiently serious to meet the objective component of the deliberate indifference test. *Id.* at 1088–89 (finding that the detainee's heart attack and death were "without a doubt, sufficiently serious to meet the objective component necessary to implicate the Fourteenth Amendment") (internal quotation marks omitted); *Canady v. Werholtz*, No. Civ.A.04-

2083-GTV, 2004 WL 1212050, at *5 (D. Kan. June 1, 2004) (cancer is sufficiently serious to satisfy objective component); *Gonzalez v. Officer in Charge of Barber Shop on Duty*, No. 99 Civ.3455(DLC), 2000 WL 274184, at *6 (S.D.N.Y. March 13, 2000) (cancer is sufficiently serious).  As alleged, Decedent died after suffering from an unmet medical need – her cervical cancer – that was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209. As discussed below, Plaintiff easily meets the objective component.

Applying a purely objective standard of liability, the facts alleged in the Complaint, as summarized above, plausibly state that Turn Key personnel, including Dr. Meyers, "did not take reasonable available measures to abate [the] risk [of substantial harm to Decedent], even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the … conduct obvious…." Gordon, 888 F.3d at 1125.  Dr. Meyers knew the following by at least by August 5, 2019:

1. Decedent had been diagnosed with chlamydia, a disease making cervical cancer more likely;

2. Decedent had been suffering from extreme hip and thigh pain; and,

3. Decedent had intense intermenstrual bleeding and suffered from anemia, a common condition for women with cervical cancer.

As set forth in the Complaint, these circumstances clearly indicate to any reasonable physician the likely presence of cervical cancer and need for an elevated level of care. Moreover, the symptoms clearly present to any lay person a medical need beyond what Defendants provided. However, despite the diagnoses and symptoms, on August 5, 2019 Defendant Myers inexplicably noted that Decedent was a "***healthy menstruating woman with mild anemia***," *see* Dkt. 2, at ¶ 19, but nonetheless ordered blood work. Nine days later, on August 14, 2019, the results of the blood work

revealed Decedent had leukocytosis, an elevation of the white blood cells indicating sickness –
like cancer**. Despite the severity of Plaintiff's symptoms and condition,** *Defendant Myers*
*inexplicably noted that the lab results were normal and that no follow-up was needed*.  Six days
later, Defendant Myers noted that Decedent's complaints were resolved despite all signs to the
contrary. Yet, Decedent's symptoms worsened.  On August 24, Decedent complained of continued
vaginal discharge, severe abdominal pain, and trouble with her bowel movements – all signs of
cervical cancer.  Decedent also told the staff that: "there is something wrong with me and I hurt
bad." *Id.* at ¶ 29. On September 3, 2019, in response to Decedent's worsening and obvious
symptoms, Defendant Myers noted that Decedent was "abusing the [sick call] system." *Id.* at ¶ 32.
Defendant Myers continually downplayed Decedent's obvious and apparent serious medical
needs. By September 3, 2019, Decedent had been complaining of vaginal bleeding and discharge
for months. Any reasonable physician would understand that vaginal bleeding and discharge that
lasts for that period of time warrants a more invasive look by an obstetrician. Instead, Defendant
Myers wrote Decedent off entirely.  *Id.* at ¶ 33. Plaintiff has aptly alleged a violation of Caleb's
Fourteenth Amendment rights under a solely objective standard.

> **B.     Applying a Subject Standard, Plaintiff Sufficiently Alleged Defendant Myers'**
> **Deliberate Indifference.**

The subjective component of the deliberate indifference analysis requires evidence that the
official "knows of and disregards an excessive risk to inmate health or safety." *Mata*, 427 F.3d at
751. A civil rights defendant is deliberately indifferent where he "has knowledge of a substantial
risk of serious harm to inmates ... [and] fails to take reasonable steps to alleviate that risk." *Tafoya*
*v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). "Because it is difficult, if not impossible, to prove
another person's actual state of mind, whether an official had knowledge may be inferred from
circumstantial evidence." *DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001). For instance,

"the existence of an obvious risk to health or safety may indicate awareness of the risk." *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk ... for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

The Tenth Circuit recognizes two types of conduct constituting deliberate indifference in the corrections medical context. *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). "First, a medical professional may fail to treat a serious medical condition properly.... The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock*, 218 F.3d at 1211 (emphasis added). A prison medical professional who serves "solely ... as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if he/she "delays or refuses to fulfill that gatekeeper role." *Id.* Further, "[a] prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [his] condition. Even a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755 (emphasis added).

Here, applying these legal standards, Plaintiff has alleged sufficient facts demonstrate that Defendant Myers was deliberately indifferent to Decedent's serious medical needs, under the traditional standard. *See* Summary of Allegations Against Defendant Myers, *supra*. Reading the Complaint in a light most favorable to Plaintiff, as this Court must, she has plausibly alleged: (A) repeated failures by "medical professional[s] … to treat a serious medical condition properly"; (B) Dr. Myers "den[ied] [Decedent] access to medical personnel capable of evaluating the need for

treatment"; and (C) "delay[s] in providing medical treatment [which] caused …. unnecessary pain [and] a worsening of [Decedent's] condition." *Sealock*, 218 F.3d at 1211; *Mata*, 427 F.3d at 755.

Defendant Myers attempts to argue that because Plaintiff alleges that Decedent was assessed by Defendant Myers and other medical staff at the Jail and received ***some*** care, Plaintiff is merely alleging malpractice and has not plausibly alleged deliberate indifference on the part of Defendant Myers. However, Plaintiff's criticisms of Defendant Myers go well beyond a mere disagreement about the proper treatment of Decedent. The plain fact that Decedent received *some* arguable care from Defendant Myers and other Turn Key personnel does not absolve Defendant Myers, who was responsible for overseeing Decedent's medical care, from constitutional liability. Plaintiff need not allege or prove a complete denial of care, as Defendant Myers argues, to plausibly allege or establish deliberate indifference. *See, e.g., Oxendine v. Kaplan,* 241 F.3d 1272, 1277 n. 7 (10th Cir. 2001) (reversing summary judgment for defendants on deliberate indifference claim and rejecting government's argument that it was "dispositive … that Oxendine received at least some treatment from Dr. Kaplan during the time period when he alleged that he received inadequate and delayed medical care."); *Hunt*, 199 F.3d at 1224 ("[T]he fact that [plaintiff] has seen numerous doctors [does not] necessarily mean that he received treatment for serious medical needs, i.e., that treatment was prescribed at all or that prescribed treatment was provided.").[18]

Here, the "treatment" provided to Decedent by Turn Key personnel, including Defendant Myers, was patently reckless and dangerous, in complete disregard of the known and obvious risks to Decedent's health and safety. Defendant Myers may have ordered tests and blood work, but

---

[18]        *See also McElligott v. Foley,* 182 F.3d 1248 (11th Cir. 1999); *Young v. City of Augusta, Ga. Through DeVaney,* 59 F.3d 1160, 1170 (11th Cir. 1995); *Hathaway v. Coughlin,* 37 F.3d 63 (2nd Cir. 1994); *Durmer v. O'Carroll,* 991 F.2d 64 (3rd Cir. 1993); *Waldrop v. Evans,* 871 F.2d 1030, 1033 (11th Cir. 1989).

those tests only confirmed how sick Decedent was and the extreme risk of cancer. And despite these tests and Defendant Myers explicitly being made aware of Decedent's conditions and symptoms – all of which pointed to cervical cancer – Defendant Myers did *nothing*. For months, it was obvious Decedent needed an urgent evaluation and treatment by a gynecologist/obstetrician. Defendant Myers, as a gatekeeper to such a physician, wholly refused to provide access to such assessment or treatment.  In fact, Defendant Myers went so far as to accuse Decedent of abusing the Jail's sick call system. In short, Plaintiff has sufficiently alleged that Defendant Myers was a "gatekeeper for other medical personnel capable of treating the condition" and "delay[ed] or refus[ed] to fulfill that gatekeeper role." *Sealock*, 218 F.3d at 1211.  Plaintiff has adequately pled deliberate indifference against Defendant Myers.

## II.     Plaintiff Is Not Alleging That Defendant Myers Is Vicariously Liable.

Despite all the allegations regarding Defendant Myers' direct deliberate indifference, Defendant Myers inexplicably argues that to the extent Plaintiff is attempting to hold him vicariously liable for the alleged constitutional violations of other Turn Key, Jail employees, or outside doctors, such claims should be dismissed (as Section 1983 claims cannot be based on vicarious liability). However, Plaintiff has not alleged that Defendant Myers can be held vicariously liable pursuant to Section 1983. As such, Defendant's argument raises a moot issue that provides no basis for dismissal.

## III.    Turn Key and Defendant Myers Are Not Entitled to Immunity Under The GTCA.

Defendant argues he is entitled to immunity as an "employee" under the GTCA. However, Turn Key, and its employees, are plainly not  "employees" as that term is used in the GTCA. The dicta from the *Barrios* decision did not alter the legal landscape. "In *Barrios*, however, the Oklahoma Supreme Court did not find that a healthcare contractor at a jail was an employee

entitled to tort immunity under the OGTCA but simply assumed the healthcare contractor was an employee for purposes of answering the certified questions before it." *Graham v. Garfield County Criminal Justice Auth.*, Case No. CIV-17-634-SLP (W.D. Okla. March 7, 2019) (unpublished) (attached hereto as Exhibit 2) at 3-5.

The GTCA is the exclusive remedy by which an injured plaintiff may recover against an Oklahoma governmental entity in tort. *See, e.g., Fuller v. Odom*, 741 P.2d 449, 451 (Okla. 1987); *see also* 51 O.S § 153(B). The GTCA generally immunizes "the state, its political subdivisions, and all of their employees acting within the scope of their employment" from liability for torts. 51 O.S. § 152.1(A); *see also* 51 O.S. § 163(C) (precluding tort actions against "an employee of the state or political subdivision acting within the scope of his employment"). This immunity is subject to a limited waiver for the state and its political subdivisions, but "only to the extent and in the manner provided" in the GTCA. 51 O.S. § 152.1(B).

Prior to *Barrios*, courts, including this Court, refused to grant private medical contractors "employee" immunity at the initial pleadings stage. For instance, this Court in *Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1344-45 (N.D. Okla. 2014), addressed the issue when ruling on Correctional Healthcare Companies, Inc.'s ("CHC") motion to dismiss filed in that case. There, this Court found that "without complete factual information and in the absence of any legal authority that dictates the application of § 152(7)(b)(7)[19] to the individual Healthcare Defendants (or to CHC) …, it is premature to determine whether § 152(7)(b)(7) covers CHC's employees and/or CHC." *Id*. at 1345.

---

[19]     Section 152(7)(b)(7) states that for purposes of the GTCA, "employees" include: "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies."

After the Oklahoma Supreme Court's decision in *Barrios*, United States District Courts in Oklahoma have split regarding the applicability of the GTCA to private companies that contract with a county to provide medical staffing or services. But *Barrios* has no impact on the legal question of whether Turn Key or Defendant Myers are "employees" under the GTCA. The parties in Barrios did not ask the Oklahoma Supreme Court to decide whether the private medical provider there, Turn Key Health, LLC, the same private medical provider at issue here, was an "employee" under §152(7)(b). *See Barrios*, 2018 OK 90, n. 5. Thus, with no analysis, the *Barrios* Court "assumed" that Turn Key was an "employee" under section 152(7)(b) and entitled to immunity. *Id.* In denying a motion to dismiss filed by Turn Key on the *Barrios* issue, the United States District Court for Western District of Oklahoma recently held and reasoned:

> Turn Key asserts that the Oklahoma Supreme Court's decision in *Barrios v. Haskell Cty. Pub. Facilities Auth.*, 432 P.3d 233 (Okla. 2018), supports a finding that it has immunity under the OGTCA. In Barrios, however, the Oklahoma Supreme Court did not find that a healthcare contractor at a jail was an employee entitled to tort immunity under the OGTCA but simply assumed the healthcare contractor was an employee for purposes of answering the certified questions before it. . . .
>
> \*                          \*                          \*
>
> The Court, therefore, finds that at this stage of the proceedings, Turn Key has not shown that it is entitled to immunity under the OGTCA and that dismissal of plaintiff's state law tort claims against Turn Key is not warranted on this basis.

Ex. 2, *Graham* Order 3-5.

Similarly, as recently observed by the Eastern District of Oklahoma:

> [Turn Key] also seeks dismissal under the Act based on statutory immunity. This court finds the situation roughly similar to *Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1345 (N.D. Okla. 2014), in which the court concluded that "without complete factual information and in the absence of any legal authority" it was premature to determine the question. Authority now exists in the form of the opinion in *Prince v. Turn Key Health Clinics, LLC*, 2019 WL 238153 (N.D. Okla. 2019), in which the court held as a matter of law on a motion to dismiss that Turn Key is an "employee" under the Act and therefore immune from tort liability. *Id.* at 9. That holding is based on an implication, not an express statement, by the Oklahoma

Supreme Court. This court still prefers the factual development available with a motion for summary judgment (and perhaps the development of controlling authority). The motion will be denied on this ground.

*Buchanan v. Turn Key Health Clinics LLC, et al*., Case No. CIV-18-171-RAW (E.D. Okla. Feb. 27, 2019) (unpublished) (attached hereto as Exhibit 3) at 5.

As shown above, Turn Key and Defendant Myers are clearly not "employees" under the GTCA as a matter of law. As such, Turn Key and Defendant Myers are not immune under the GTCA.  At the very least, as was the case in *Revilla, Graham, and Buchanan*, it is premature to determine whether Turn Key is immune from tort liability under the GTCA. See, e.g., *Cotton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 699 F. Supp. 251, 253 (N.D. Okla. 1988) ("[W]here material issues of fact are unresolved, a motion to dismiss should not be granted.").[20]  As such, at this point, the Court should deny Defendant Myers' Motion to Dismiss.

## CONCLUSION

Contrary to Defendant Myers' arguments, Plaintiff has sufficiently alleged deliberate indifference by Defendant Myers – under both an objective analysis and a subjective analysis. Further, Defendant Myers is not immune from Plaintiff's state law claims under the OGTCA. Therefore the Court should deny Defendant Myers' Motion to Dismiss.

WHEREFORE, premises considered, for the reasons set forth above, Plaintiff respectfully requests this Court deny Defendant Myers' Motion to Dismiss.

---

[20]     For example, Plaintiff could learn during discovery that Turn Key's insurance coverage for negligence exceeded the GTCA limits.  That would indicate that Turn Key does not consider itself an "employee" for purposes of the GTCA.

Respectfully submitted,

**SMOLEN | LAW, PLLC**

/s/Dustin J. Vanderhoof
Donald E. Smolen, II, OBA#19944
Laura L. Hamilton, OBA#22619
Dustin J. Vanderhoof, OBA #21388
John Warren, OBA #33635
611 S. Detroit Ave.
Tulsa, OK 74120
P: (918) 777-4LAW (4529)
F: (918) 890-4529
don@smolen.law
laura@smolen.law
dustin@smolen.law
jack@smolen.law
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of April, 2021, I submitted the above and foregoing to the Clerk of Court using the ECF System for filing and for transmission of a Notice of Electronic Filing to the following ECF registrants:

Joel L. Wohlgemuth
Jo Lynn Jeter

/s/Dustin J. Vanderhoof