# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| YOLANDA LUCAS, as the Special Administrator of the Estate of MICHELLE ANN CADDELL, Deceased, <br><br> Plaintiff, <br><br> v. <br><br> TURN KEY HEALTH CLINICS, LLC, a Domestic Limited Liability Corporation; VIC REGALADO, individually and in his official capacity as Tulsa County Sheriff; GARY MYERS, MD; and SHIRLEY HADDEN,[1] <br><br> Defendants. | Case No. 20-CV-601-TCK-CDL |

## OPINION AND ORDER

Before the Court are Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) filed by defendants Turn Key Health Clinics, LLC ("Turn Key"), Tulsa County Sheriff Vic Regalado ("Regalado"), and Gary Myers, M.D. ("Dr. Myers"). Docs. 19, 20, 22. Plaintiff Yolanda Lucas, Special Administrator of the Estate of Michelle Ann Caddell, Deceased ("Lucas" or "Plaintiff"), opposes all three motions. Docs. 30, 31, 32.

**I. Introduction**

Lucas filed this lawsuit as administrator of the estate of Michelle Ann Caddell, who died of squamous cell cervical cancer on August 16, 2020. Doc. 2. Her Complaint asserts claims against Turn Key and Dr. Myers for violation of the Eighth and/or Fourteenth Amendment under 42 U.S.C.

---

[1] Shirley Hadden "("Hadden"), who the Complaint alleges was the Services Administrator for Turn Key, has not been served in the case.

§1983 pursuant to a municipal theory of liability; violation of the Fourteenth Amendment's Equal Protection Clause; and a state law tort claim for medical negligence/wrongful death. She asserts claims against Regalado in his official capacity for violation of the Eighth and/or Fourteenth Amendment under 42 U.S.C. 1983 pursuant to a municipal liability theory and violation of the Fourteenth Amendment's Equal Protection Clause.

Turn Key, Dr. Myers and Sheriff Regalado have all filed motions to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## II. Applicable Law

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 562.

For the purpose of making the dismissal determination, a court must accept as true all the well-pleaded allegations, even if doubtful in fact, and must construct the allegations in the light most favorable to the claimant. *Id.* at 555; *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 120, 1215 (10th Cir. 2007); *Moffett v. Haliburton Energy Servs., Inc.*, 291 F.3d 1227, 1231 (10th Cir. 2002).

## III. Allegations of the Complaint

The decedent, Michelle Ann Caddell, was arrested and booked into the Tulsa County Jail (the "Jail") on or about December 27, 2018. Doc. 2, Complaint, ¶13. While incarcerated, she

tested positive for Chlamydia on January 23, 2019. *Id.*, ¶14. It is well-known that having Chlamydia significantly increases the likelihood of developing cervical cancer. *Id.*

After being diagnosed with Chlamydia, Caddell made her first documented complaint of vaginal discharge to Jail staff on June 22, 2019, and on July 5, 6 and 7, 2019, she submitted requests for medical treatment related to pain she was experiencing in her left hip and thigh. *Id.*, ¶¶15-16. Caddell was evaluated by Nurse Sellu, who noted that Caddell's hip pain had begun four weeks earlier, and that she had been "seen in sick call twice for this issue." *Id.*, ¶17.

On August 3, 2019, Caddell reported to Jail nursing staff that she felt like she had a blood clot in her left thigh. *Id.*, ¶18. On August 5, 2019, she was evaluated by Dr. Myers for left hip/groin pain and heavy intermenstrual bleeding. *Id.*, ¶19. Dr. Myers determined she was not suffering from deep vein thrombosis ("DVT") but—concerned about her bleeding—he ordered blood work. *Id.* He noted Caddell was a "healthy menstruating woman with mild anemia." *Id.*

Anemia—a condition in which a person lacks enough healthy red blood cells to carry adequate oxygen to the body's tissues—is common in cancer patients, especially those with cervical cancer. *Id.*, ¶20.

On August 10, 2019, Caddell put in a medical request for complaints of continuous vaginal discharge. Nurse Chumley noted Caddell had been evaluated multiple times for complaints of irregular vaginal discharge. A culture of the discharge was ordered. *Id.*, ¶21.

On August 14, 2019, the results of the blood work ordered by Dr. Myers revealed that Caddell had leukocytosis—an elevation of the white blood cells indicating sickness. However, the doctor noted only that the lab results were normal, and that no follow-up was needed. *Id.*, ¶22. On August 15, 2019, the results of the vaginal culture revealed heavy growth of Escherichia Coli ("E. coli"). *Id.*, ¶23. E. coli strains possess a plethora of virulence factors that contribute to disease,

3

and are the most common cause of community-acquired urinary tract infections ("UTI"), and are a common cause of bacterial vaginosis ("BV"). *Id.* By that date, Dr. Myers and Jail staff were aware that Caddell had been diagnosed with Chlamydia; had been complaining for weeks of ongoing hip/groin pain, abnormal vaginal discharge and bleeding; had mild leukocytosis and a heavy growth of E. coli and her symptoms were becoming more severe, not less. *Id.*, ¶24. However, Caddell was merely given Tylenol instead of being sent for further evaluation and diagnostic testing. *Id.*, ¶25.

Despite continued complaints of irregular vaginal bleeding and discharge, on August 20, 2019, Dr. Myers incorrectly noted that Caddell's complaints had resolved. *Id.*, ¶27. On August 24, Caddell advised that she was having difficulty with bowel movements. *Id.*, ¶28. On August 26, 2019, Caddell still had not been seen by a doctor and again wrote in to the nursing staff, stating that she was "sorry for putting a sick call in all the time "[b]ut there is something wrong with me and I hurt bad." *Id.*, ¶29. Dr. Myers evaluated Caddell on August 27, 2019. *Id.*, ¶31. In his notes from the evaluation, Dr. Myers stated that Caddell "has had frequent sick calls—some of which do not fulfill medical logic." *Id.*, ¶31. On September 3, 2019, Dr. Myers refused Caddell's request for more ibuprofen for her extreme, ongoing pain, and stated that Caddell was "abusing the [sick call] system." *Id.*, ¶32.

Dr. Myers continually downplayed Caddell's serious medical needs. By September 3, 2019, she had been complaining of vaginal bleeding and discharge for months, and any reasonable physician would understand that her symptoms warranted a more invasive look by an obstetrician, but Dr. Myers wrote Caddell off entirely. *Id.*, ¶33.

On September 15, 2019, Caddell spoke with Nurse Suzanne, who noted that she had been experiencing "menstrual cycle with blood clots and pain starting 10 months ago." *Id.*, ¶34. Nurse

4

Suzanne recognized how serious Caddell's symptoms were and placed a referral for her to see an obstetrician. *Id.* On September 20, 2019, Defendant Jail Administrator Hadden unilaterally cancelled the referral, advising incorrectly that Caddell had "seen the medical director multiple times without complaint of 'months of heavy bleeding.'" *Id.*, ¶35. Despite the months of documented bleeding, including Dr. Myers' diagnosis of anemia, Hadden informed Dr. Myers that Caddell's "excessive amount of vaginal bleeding needs to be verified before she is tasked to see Dr. Hameed." *Id.*, ¶36.

Caddell underwent a Complete Blood Count ("CBC") test on September 23, 2019. *Id.*, ¶37. The results showed she was experiencing abnormal uterine bleeding and her hemoglobin levels had dropped sharply within the previous six weeks. *Id.* She was seen by an obstetrician, Dr. Aktar Hameed, on Sept. 27, 2019. *Id.*, ¶38. Dr. Hameed determined her "cervix is friable, irregular, hypertrophied, and with degenerating tissue extending to posterior vaginal vault," opined that Caddell had "probable invasive cancer of the cervix," and ordered a Pap Smear to confirm. *Id.*, ¶38. On October 3, 2019, Caddell was evaluated by Jail medical staff, and reported experiencing pain levels of "10/10." *Id.*, ¶39. On October 6, 2019, the Pap Smear revealed atypical squamous cells. *Id.*, ¶40. Rather than have Caddell evaluated immediately so she could receive treatment for what was very likely cancer, a second Pap Smear was ordered. *Id.*, ¶41.

On October 30, 2019, Caddell began discharging tissue from her vagina, in addition to blood. *Id.*, ¶42. She had not been back to see Dr. Hameed or any other obstetrician since the October 6, 2019 appointment, and her condition had gotten so bad by this point that she was soaking through a pad approximately every 20 minutes. *Id.*, ¶42. Jail medical staff noted that an "OBGYN will not be in the building until 11/10/19 so due to her symptoms getting worse she was sent out via deputy for further evaluation," and Caddell was transferred to Hillcrest Hospital. *Id.*,

5

¶43. Upon arrival, Caddell was administered morphine because of her extreme pain. *Id.*, ¶44. After performing a biopsy, physicians at Hillcrest determined that Caddell had squamous cervical carcinoma that was "at least stage 3" and extensive necrosis. They determined that she would need radiation and/or chemotherapy. *Id.*, ¶46.

Upon learning of the severity of Caddell's diagnosis, Defendants "worked swiftly to have [her] released from custody so that the County and Turn Key would not incur the cost of her cancer treatment." *Id.*, ¶46. She was released from jail on November 5, 2019, and "left to deal with her cancer." *Id.*

At an appointment at Hillcrest on November 9, 2019, it was discovered that Caddell had also developed DVT (deep vein thrombosis) in her left leg. *Id.*, ¶47. As a result of the DVT diagnosis, Caddell had an Interior Cava ("IVC") filter placed in her left leg on November 13, 2019. *Id.*, ¶48.

Caddell fought the cancer for months, undergoing both radiation treatments and chemotherapy. *Id.*, ¶49. Eventually, she was taken to the Porta Caeli House, where she remained until she succumbed to cancer on August 16, 2020. *Id.*, ¶49.

Caddell died as a result of cervical cancer that she was exhibiting symptoms of while in the custody and care of the Defendants. *Id.*, ¶51. Cervical cancer is the result of infection with one of the known carcinogenic subtypes of the human papillomavirus ("HPV"), and is one of the few cancers for which screening has a major impact on prevention. *Id.*, ¶52. Access to screening and appropriate follow-up of positive tests can eliminate disease in individuals and decrease mortality for populations. *Id.* Initial signs and symptoms of cervical cancer include (1) abnormal vaginal bleeding; (2) unusual discharge from the vagina; and (3) pain in the pelvic region. *Id.*, ¶53.

Defendants noted that Caddell suffered from unusual vaginal discharge as early as June 22, 2019; that she had pain in her pelvic region as early as July 8, 2019; and that she experienced abnormal vaginal bleeding as early as August 5, 2019. *Id.*, ¶¶54-56.

Signs and symptoms of a more advanced cervical cancer include: (1) swelling of the legs; (2) problems urinating or having a bowel movement; and (3) blood in the urine. *Id,* ¶7. Defendants noted that Caddell suffered from swelling of her legs as early as August 2, 2019, and that she suffered from problems having bowel movements as early as August 24, 2019. *Id.*, ¶¶58-59.

Caddell repeatedly sought treatment for her symptoms; however, the medical apparatus at the Jail grossly failed her. *Id.*, ¶60.

The number of women in Oklahoma's jails has increased more than 20-fold from 1995 through 2015. *Id.*, ¶63. According to a June 2018 report by the Prison Policy Initiative ("PPI"), Oklahoma's female incarceration rate has surpassed not only that of every other state in the U.S., but also of almost every other nation. *Id.*, ¶64. Based on the number of female inmates within the Jail, Defendants should be on alert for the dangers of vaginal health, cervical cancer and the symptoms associated with it. *Id.*, ¶65.

Defendants have a policy of not providing proper access to feminine hygiene products, which have been shown to limit the occurrence of UTIs, HPV and ultimately cervical cancer. *Id.*, ¶68. One former jail inmate reported that Jail staff would refuse to provide feminine hygiene products, and as a result, the female inmates at the Jail hold onto feminine hygiene products "like a treasure." *Id.*

The Complaint alleges that Tulsa County Sheriff Office ("TCSO"), the County and/or Turn Key promulgated policies, practices or customs that result in negative medical outcomes at the Jail, including Caddell's death. *Id.*, ¶¶116, 126. Specifically, Plaintiff alleges:

7

- The contract between Tulsa County and Turn Key incentivizes cost-cutting measures in delivery of medical and mental health care in order to achieve net profits, including under-prescribing medication, under-administrating medication, and avoiding off-site medical costs. *Id.*, ¶¶83-85.

- Turn Key has no protocol or clear policy regarding medical monitoring and care of inmates with complex or serious medical needs, including assessing and treating obvious or known symptoms of emergent and life-threatening conditions. *Id.*, ¶¶87, 88.

- Turn Key does not train medical staff regarding appropriate standards of care for inmates with complex or serious medical needs, including opiate withdrawal, heart disease and seizure disorder. *Id.*, ¶87.

- Turn Key has an established practice of failing to adequately assess and treat—and ignoring and disregarding—obvious or known symptoms of emergent and life-threatening conditions. *Id.*, ¶88.

- These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs. *Id.*, ¶89.

- Turn Key had a policy, practice or custom of inadequately staffing county jail, including the Tulsa County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like the Decedent, with complex and serious medical needs. *Id.*, ¶98.

- This system placed inmates with complex, serious and life-threatening medical conditions, like the Decedent, at substantial risk of harm, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations. *Id.*, ¶99.

- In a further attempt to minimize costs, the Defendants provided substandard care to female inmates like the Decedent by failing to provide access to feminine hygiene products and failing to offer them appropriate treatment for vaginal infections, including UTIs and HPV. *Id.*, ¶100.

- TCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed female inmates like the Decedent at excessive risk of harm, but failed to alleviate the known and obvious risks, in deliberate indifference to the rights of inmates like the Decedent. *Id.*, ¶101.

- TCSO failed to train its detention staff on how to care for or supervise inmates with complex or serious medical needs. *Id.*, ¶103.

- Defendants have a duty under the Eighth Amendment to provide medical care to all inmates in their custody in a nondiscriminatory manner. *Id.*, ¶132.

- As a woman, the Decedent was a member of a suspect class and was unlawfully discriminated against because of her sex. *Id.*, ¶131.

- Plaintiff was subjected to disparate treatment by Turn Key and/or the TCSO as a result of the jail's policy, practice, custom or culture that causes intentional disparate care and outcomes in medical treatment with females housed within the Jail, in stark contrast to the medical treatment of similarly-situated male inmates. *Id.*, ¶133.

- The Defendants' policies, practices, and customs that result in disparate medical care provided to female inmates have been implemented in an attempt to cut costs. The discriminatory policies and practices serve no legitimate governmental purpose. *Id.*, ¶136

- The Defendants' discriminatory treatment of female inmates, including the Decedent, was committed knowingly, intentionally, maliciously and/or in reckless disregard of female inmates' rights.

Plaintiff asserts the following claims:

1. Failure to provide adequate medical care in violation of the Eighth and/or Fourteenth Amendments to the Constitution and 42 U.S.C. §1983 against Turn Key and Dr. Myers individually and against Regalado in his official capacity;

2. Municipal/ "Monell" Liability against Turn Key;

3. Violation of the Fourteenth Amendment pursuant to 42 U.S.C. §1983 against Turn Key and against Regalado in his official capacity;

4. Negligence/wrongful death against Turn Key and Dr. Myers.

*Id.* at pp. 21-26. She seeks actual and compensatory damages and punitive damages in excess of $75,000. *Id.* at p. 26.

In their Motions to Dismiss, Defendants Myers, Turnkey and Regalado argue that:

A. Plaintiff's Complaint fails to state a §1983 claim under a theory of municipal liability;

B. Plaintiff's Complaint fails to state a claim for violation of the Equal Protection Clause; and;

C. Plaintiff's claim for negligence/wrongful death is barred by the immunity afforded under the Oklahoma Governmental Tort Claims Act.

Plaintiff opposes the motions.

**IV. Analysis**

**A. Municipal/"Monell" Liability**

In order to hold a defendant liable pursuant to §1983 on a theory of municipal liability, Plaintiff must plead and prove an underlying constitutional violation by one of its officers. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002). Additionally, she must plead facts establishing "1) the existence of a municipal policy or custom, and 2) a direct causal link between the policy or custom and the injury alleged." *Bryson v. City of Oklahoma City,* 627 F.3d 784, 788 (10th Cir. 2010).

A municipal policy or custom may take the following forms: (1) a formal regulation or policy statement; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference to the injuries that may be caused.'" *Id.* (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010).

In summary, Plaintiff must allege both the existence of a municipal policy and facts which—taken as true—establish that the policy or custom was the direct cause of the alleged injury. "[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but has not 'show[n]' that pleader is entitled to relief." *Iqbal*, 566 U.S.662, 678 (citing Fed. R. Civ. P.8(a)(2)).

Plaintiff's Complaint asserts that her survival causes of action are based on violations of the decedent's rights under either the Eighth or Fourteenth Amendment. The Tenth Circuit has held that "[t]he constitutional protection against deliberate indifference to a *pretrial detainee's* serious medical condition springs from the Fourteenth Amendment's Due Process Clause." *Burke v. Regalado*, 935 F.3d 960, 991 (10th Cir. 2019) (emphasis added). However, "[u]nder the Fourteenth Amendment's due process clause, pretrial detainees . . . are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment," and accordingly, a pretrial detainee's "inadequate medical attention claim must be judged against the "deliberate indifference to serious medical needs" test of *Estell v. Gamble*, 429 U.S. 97 104. . . (1976)." *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10nth Cir. 1992) (internal citation omitted).

The Tenth Circuit has explained:

> The analysis under *Estelle* is two pronged. The initial question is whether there is evidence of "serious medical needs." A constitutional violation only occurs when a government official's "deliberate indifference" is exhibited toward such needs.

*Id.* (citing *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208-09 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991)). The deliberate indifference standard has an objective and a subjective component.

The objective component requires that the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment clause." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Defendants concede that Caddell's death satisfies the objective component.

To satisfy the subjective component, "the plaintiff must show the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Burke v. Regalado*, 935 F.3d 960, 991 (10th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837). The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quotations omitted). The Tenth Circuit has stated that "an official or municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." *Barie v. Grant County, Utah*, 119 F.3d 862, 869 (10th Cir. 1997) (quoting *Berry v. City of Muskogee*, 900 F.2d 1489, 1495-96) (internal citations and quotations omitted)).

While some have argued that the traditional deliberate indifference standard requiring proof of a subjective component was overruled by *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015), the Tenth Circuit, in *Strain v. Regalado*, stated, "at no point did *Kingsley* pronounce its application to Fourteenth Amendment deliberate indifference claims or otherwise state that we should adopt a purely objective standard for such claims, so we cannot overrule our precedent on this issue." 977 F.3d 984, 993 (10th Cir. 2020). Thus, in the Tenth Circuit, "[a] claim for inadequate medical attention will be successful if the plaintiff shows 'deliberate indifference to serious medical needs.'" *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Estate of Hocker v. Walsh*, 995, 998 (10th Cir. 1994)). However, "[t]he Supreme Court has cautioned that 'an inadvertent failure to provide adequate medical care' does not rise to a constitutional violation." *Id.*, (quoting *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976)).

    **1. Dr. Myers and Turnkey**

        **a. Failure to Provide Adequate Medical Care in Violation of the Eighth and/or Fourteenth Amendments (42 U.S.C. §1983)**

To satisfy the subjective component of deliberate indifference, Plaintiff must allege facts which—taken as true—show that Dr. Myers knew of an excessive risk to Decedent's health and, with that knowledge, intentionally disregarded that risk. *See Burke*, 935 F.3d at 992. Allegations of negligence or even gross negligence are not sufficient to meet this standard. *Randall v. Bd. of Cnty. Comm'rs*, 184 Fed. Appx 723, 726 (10th Cir. 2006). Likewise, claims of medical malpractice fall short of the standard. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Here, the allegations of the Complaint—taken as true—undermine Plaintiff's claim of deliberate indifference, establishing instead that Decedent made her first documented complaint of vaginal discharge to Jail staff on June 22, 2019; submitted requests for medical treatment for pain in her left thigh on July 5, 6 and 7, 2019; and was evaluated by a nurse on July 14, 2019. Additionally, the allegations establish that Dr. Myers saw Decedent on August 3, 2019 for left hip/groin pain and heavy intermenstrual bleeding, and concluded she was not suffering from DVT, but—concerned about her bleeding—ordered blood work. Likewise, after Decedent submitted another medical request for complaints of continuous vaginal discharge on August 10, 2019, Nurse Chumley ordered a culture of the discharge.

Dr. Myers argues that because the allegations of the Complaint establish Decedent actually received *some* medical care and treatment, the Complaint merely alleges malpractice rather than deliberate indifference on his part.

The Tenth Circuit has recognized two types of conduct constituting deliberate indifference:

> First, "a medical professional may fail to treat a serious medical condition properly. Where this sort of conduct is alleged, the medical professional has available the defense that he was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent. *See, e.g., Estelle v. Gamble*, 429 U.S. at 105-06 (1976)."

> The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment. *See, e.g.*, *Ramos v. Lamm*, 639 F.2d 575, (10th Cir. 1980). *Ordinarily, a medical professional will not be liable for this second kind of deliberate indifference, because he is the person who provides the treatment. If, however, the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, its stands to reason that he also may be liable for deliberate indifference from denying access to medical care.*

*Sealock v. Colorado*, 218 F.3d 1205,1211 (10th Cir. 2000) (citing *Estelle*, 429 U.S. at 105-06) (emphasis added)).

Plaintiff's Complaint alleges the first type of deliberate indifference, *i.e.*, that despite being made aware of Decedent's condition and symptoms, Dr. Myers and Hadden refused to have her seen by a gynecologist. These allegations—taken as true—state a claim for medical malpractice. However, they fail to state a claim for deliberate indifference, as the Complaint itself recites a litany of treatment provided by the Turnkey doctor and nurses.[2]

Accordingly, the Court concludes that the Motions to Dismiss filed by Dr. Myers and Turnkey unfortunately must be granted.

### b. OGTCA Immunity

Dr. Myers, citing *Barrios v. Haskell County Public Facilities Authority*, 432 P.3d 233 (Okla. 2018) also argues he is entitled to immunity under the Oklahoma Governmental Tort Claims Act ("OGTCA"), 51 O.S. §§151, *et seq*. The OGTCA provides that the "state or a political

---

2 Dr. Myers also argues that to the extent Plaintiff is attempting to hold him vicariously liable for the alleged constitutional violations of other Turn Key or Jail employees or outside doctors, those claims should be dismissed, as claims of vicarious liability cannot be asserted under §1983. However, the Complaint does not assert any claim for vicarious liability against Dr. Myers. Doc. 2.

14

subdivision shall not be liable if a loss or claim results from" the "[[p]rovision, equipping, operation or maintenance of any prison, jail or correctional facility . . . ." 51 O.S. §§155, 155(25).

The OGTCA is the exclusive remedy by which an injured plaintiff may recover against an Oklahoma governmental entity in tort. *See, e.g., Fuller v. Odom*, 741 P.2d 449, 451-52 (Okla. 1987) (stating that the Oklahoma Legislature "has specifically abrogated any previously existing common law or statutory right of recovery for torts committed by a governmental entity or its employees while acting within the scope of their employment."). The "state" and "political subdivisions" afforded immunity include their employees, defined as "any person who is authorized to act on behalf of a political subdivision or the state . . ." 51 O..S. §152(7). Employees include "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies. . . ." 51 O.S. §152(7)(b)(7).

Prior to *Barrios*, this Court refused to grant private medical contractors or their employees "employee immunity" at the initial pleadings stage. *See, i.e.*, *Revilla v. Glanz*, 8 F. Supp.3d 1336, 1344-45 (N.D. Okla. 2014) (finding that "without complete factual information and in the absence of any legal authority that dictates the application of §152(7)((b)(7) to the individual Healthcare Defendants or to [Correctional Healthcare Companies, Inc.] . . . it is premature to determine whether §152(7)(b)(7) covers CHC's employees and/or CHC.")

However, in *Barrios*, the Oklahoma Supreme Court, answering a certified question from the United States District Court for the Eastern District of Oklahoma, acknowledged that "[g]enerally speaking, the staff of a healthcare contractor at a jail are 'employees' who are entitled to tort immunity under the OGTCA by virtue of sections 152(7)(b), 153(A), and 155(25)." 432

15

P.3d 233, 236, n.5 (Okla. 2018). Accordingly, the Court concludes that the OGTCA immunizes Dr. Myers from liability for his provision of medical services at the Tulsa County Jail.

### 2. Turnkey and Sheriff Regalado

#### a. §1983 Claims

There can be no municipal or organizational liability "when there was no underlying constitutional violation by any of its officers." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (citing *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)). Because the Court has concluded that the Complaint fails to state a viable §1983 claim against Dr. Myers, neither Turn Key nor Sheriff Regalado can be held liable for the alleged violation of her constitutional right to medical treatment.

#### b. Equal Protection Claim

The Complaint alleges Turn Key and Sheriff Regalado violated her Fourteenth Amendment right to equal access to medical free from discrimination. Doc. 2 at pp. 24-25. Specifically, Plaintiff asserts that the Decedent was subjected to disparate treatment by Turn Key and/or the TCSO as a result of the Jail's "policy, practice, custom or culture that causes intentional disparate care and outcomes in medical treatment with females housed within the Jail, in stark contrast to the medical treatment of similarly-situated male inmates." *Id.* at p. 24. The Complaint alleges that Turn Key has "a policy of not providing access to feminine hygiene products" and that a former unidentified jail inmate "reported that the Jail staff would refuse to provide feminine hygiene products. Doc. 2, ¶68. However, the Complaint fails to state how this policy relates to Decedent's treatment at the Jail, nor does it allege that any of her medical issues were linked to lack of access to feminine hygiene products. *Id.*

Accordingly, the Equal Protection Claim against Turn Key and Sheriff Regalado (Docs.19, 20) are subject to dismissal.

## V. Conclusion

The Motions to Dismiss filed by defendants Turn Key Health Clinics, LLC, Tulsa County Sheriff Vic Regalado, and Gary Myers, M.D. (Docs. 19, 20, 22) are hereby granted.

ENTERED this 8th day of December, 2021.

TERENCE C. KERN
United States District Judge